6 F.3d 131
 17 Employee Benefits Ca 1238
 Nancy M. SMITH and Joseph L. Smith, her husband
v.
The HARTFORD INSURANCE GROUP; The Provident Life and
Accident Insurance Group; National Medical Enterprises
Inc.; National Medical Specialty Hospital Group;
Psychiatric Institutes of America Health Care Group;
Pennsylvania Health Corp., d/b/a The Rehab Hospital in
Mechanicsburg; P.I.A. Voluntary Employees Beneficiary
Association Group Insurance Plan; P.I.A. Voluntary
Employees Beneficiary Association Administrative Committee,
Nancy M. Smith and Joseph L. Smith, Appellants.
 No. 92-7310.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 8, 1993.
Decided Oct. 4, 1993.
 
 Richard C. Angino (argued), Angino & Rovner, Harrisburg, PA, for appellants.
 Andrew H. Cline (argued), Kirkpatrick & Lockhart, Harrisburg, PA, for appellees Pennsylvania Health Corp., d/b/a The Rehab Hosp. in Mechanicsburg; P.I.A. Voluntary Employees Beneficiary Ass'n Group Ins. Plan; P.I.A. Voluntary Employees Beneficiary Ass'n Administrative Committee.
 Before HUTCHINSON and SCIRICA, Circuit Judges and STANDISH, District Judge*
 OPINION OF THE COURT
 SCIRICA, Circuit Judge.
 
 
 1
 This is an action seeking health insurance coverage under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Secs. 1001-1461 (1988). Nancy Smith has required skilled nursing care since suffering a cerebral hemorrhage in August 1985. After her employer changed its group health policy to a self-insured plan, she enrolled in the new plan based on the employer's erroneous representations that she would receive the same level of nursing care coverage. When the plan stopped providing coverage, Nancy and Joseph Smith filed suit, alleging the employer's misrepresentations entitled them to relief under ERISA. The district court granted summary judgment to defendants. We will affirm in part and reverse in part and remand.
 
 I.
 
 2
 On August 27, 1985, Nancy Smith suffered a cerebral hemorrhage while working as a nurse's aide for the Rehab Hospital in Mechanicsburg, Pennsylvania. As a result, she required continuous care in a skilled nursing facility, and became a patient at Seidle Memorial Hospital in Mechanicsburg. At the time of her hemorrhage, Mrs. Smith was covered by the Rehab Hospital's group health insurance policy with Capital Blue Cross and Pennsylvania Blue Shield. The policy, which paid for skilled nursing care up to a maximum lifetime benefit of $1 million and did not limit coverage to a specific number of days, covered Ms. Smith's expenses.
 
 
 3
 On December 1, 1986, while Mrs. Smith was still receiving care at Seidle Memorial, the Rehab Hospital's parent company directed its subsidiary hospitals to switch their health care coverage to self-funded insurance plans. Accordingly, the Rehab Hospital replaced the Blue Cross/Blue Shield policy with such a plan, entitled the P.I.A. Voluntary Employees Beneficiary Association Plan (the "VEBA Plan" or "Plan"). Unlike the Blue Cross/Blue Shield policy, the VEBA Plan covers skilled nursing care only for the first 180 days of the patient's confinement.
 
 
 4
 Rehab Hospital employees received only one week to decide whether to enroll in the VEBA Plan. The Hospital's personnel director Beverly North conducted seminars to help employees make this decision. At the seminars, North distributed a one-page document entitled "Transition Provision," summarizing certain effects of the change in plans. This document provides in part:
 
 
 5
 WE WILL WAIVE OUR PRE-EXISTING CONDITION LIMIT FOR EVERYONE ENROLLED IN YOUR PRIOR PLAN AS OF 11/31/86
 
 
 6
 IF YOU OR YOUR DEPENDENTS ARE IN THE HOSPITAL OR DISABLED ON 12/1/86, BENEFIT PAYMENTS WILL BE THOSE OF YOUR PRIOR PLAN OR OUR PLAN, WHICHEVER IS LESS
 
 
 7
 IF YOU ARE CURRENTLY DISABLED AND RECEIVING BENEFITS UNDER YOUR CURRENT CARRIER, BENEFITS WILL CONTINUE TO BE PAID TO YOU UNDER THE PROVISIONS OF THAT POLICY, NOT OURS
 
 
 8
 Despite the apparent contradiction between the last two paragraphs, North interpreted the "Transition Provision" to mean that benefits under the new self-insured plan would be the same as, or better than, those under the Blue Cross/Blue Shield policy.
 
 
 9
 On December 3, 1986, Joseph Smith, on behalf of his wife, attended two of the seminars North conducted on the changes in benefits. North distributed the Transition Provision and advised those attending that their benefits would not change under the VEBA Plan. Concerned about his wife's benefits, Smith specifically asked North at the seminar and afterwards in her office what his wife's benefits would be under the VEBA Plan. Referring to the above-quoted paragraphs of the Transition Provision, North assured Smith his wife would receive exactly the same benefits under the VEBA Plan as under the Blue Cross/Blue Shield policy. Smith then elected to enroll his wife in the VEBA Plan.
 
 
 10
 When the VEBA Plan failed to make payments for Mrs. Smith's nursing care in the months following the Smiths' enrollment, Mr. Smith repeatedly contacted Plan representatives to inquire about coverage. Each time these representatives told him not to worry and attributed the failure to pay Mrs. Smith's nursing care bills to administrative delays. Initially, Mr. Smith telephoned North several times asking how to obtain payment for his wife's bills. North told him to submit the bills to the Hartford Insurance Group, the VEBA Plan's processing agent. In January 1987, when payments were not forthcoming, Seidle Memorial's billing supervisor Sandra Fertenbaugh contacted the Rehab Hospital to inquire about coverage. Karen Davies, North's successor, advised Fertenbaugh that Smith was covered under the Plan. Apparently believing Hartford had simply replaced Blue Cross/Blue Shield as the group insurer, Mr. Smith telephoned Hartford several times. Two Hartford claims processors assured him his wife's bills would be paid, and attributed the Plan's failure to pay claims to the delay in receiving Mrs. Smith's medical records and the transition in plans. Despite these repeated assurances, Hartford sent Mr. Smith a letter on August 26, 1987, informing him his wife's skilled nursing benefit was exhausted because her stay in the skilled nursing facility had exceeded the 180-day limit under the VEBA Plan, and that no further payment would be made.
 
 
 11
 Mr. Smith promptly appealed the denial of benefits in a letter to the Rehab Hospital and a formal complaint to the Pennsylvania Department of Insurance, explaining he had enrolled his wife in the VEBA Plan based on assurances he received in the Transition Provision and from Ms. North and Hartford that his wife would continue to receive the same coverage for her nursing care expenses. Hartford responded by letter on February 22, 1988, stating the VEBA Plan would agree to pay for nursing care services through April 7, 1988. On December 6, Hartford reiterated to Mr. Smith no coverage would be provided for care given after April 7, only to receive further appeals from Mr. Smith. On July 14, 1989, Hartford communicated the Plan's final offer--to extend coverage through June 15, 1989--if Mr. Smith would accept this as full and final payment. He rejected this offer. The Plan has not paid Mrs. Smith's expenses since April 7, 1988, although she remains a skilled nursing care patient at Seidle Memorial.
 
 II.
 
 12
 On July 17, 1990, the Smiths brought suit to obtain the disputed coverage in the Court of Common Pleas of Cumberland County, Pennsylvania against Hartford and Provident Life and Accident Insurance Company, who replaced Hartford as the Plan's claim processor. Hartford and Provident removed the case to the United States District Court for the Middle District of Pennsylvania because the Smiths' claim was subject to ERISA, and moved to dismiss the complaint.[1] The Smiths amended their complaint, naming additional defendants, and all defendants moved unsuccessfully to dismiss this complaint. The parties stipulated to the dismissal of all defendants other than the Rehab Hospital, the VEBA Plan, and the Plan's Administrator, and the case proceeded against these parties.
 
 
 13
 In the district court, the Smiths claimed defendants' actions gave rise to ERISA liability under three theories. They contended the Transition Provision coupled with the Hospital's oral representations to them constituted an "employee welfare benefit plan" enforceable in a breach of contract action under Sec. 502(a)(1)(B) of ERISA, 29 U.S.C. Sec. 1132(a)(1)(B). The Smiths also maintained these representations formed the basis for an equitable estoppel claim under Sec. 502(a)(3) of ERISA, 29 U.S.C. Sec. 1132(a)(3). Finally, they claimed the Hospital's actions constituted a breach of fiduciary duty running from the Plan and its Administrator to the Smiths, a claim also actionable under Sec. 502(a)(3). Defendants moved for summary judgment.
 
 
 14
 Granting the motion, the district court held the written and oral representations did not contain sufficiently specific information regarding benefits and eligibility to constitute an employee benefit plan enforceable under ERISA. The court also ruled the Smiths could not recover on their equitable estoppel claim because they could not show injury resulting from their reliance on the Hospital's misrepresentations. To establish injury, the Smiths maintained that were it not for the misrepresentations, they could have obtained alternative coverage. But the district court held the Smiths had not introduced sufficient evidence that such coverage was available to them to withstand summary judgment. The court also held the Smiths' inability to show injury justified dismissal of their claim for breach of fiduciary duty.[2] The Smiths appealed.
 
 III.
 A.
 
 15
 We have jurisdiction under 28 U.S.C. Sec. 1291. We exercise plenary review over the district court's grant of summary judgment, which we can uphold only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1231 (3d Cir.1991); Fed.R.Civ.P. 56(c).
 
 B.
 
 16
 ERISA grants the beneficiary of an "employee welfare benefit plan," 29 U.S.C. Sec. 1002(1), an express contract action "to recover benefits due to him under the terms of his plan," 29 U.S.C. Sec. 1132(a)(1)(B). The Smiths invoke this section, claiming the Transition Provision coupled with North's oral representations to Mr. Smith constitute an enforceable "employee welfare benefit plan."ERISA does not define the critical term "plan." But we have ruled that a plan need not be written, Deibler v. United Food & Comm. Workers' Local Union 23, 973 F.2d 206, 209 (3d Cir.1992), and we have adopted the test developed in Donovan v. Dillingham, 688 F.2d 1367 (11th Cir.1982) (en banc), to determine whether informal written or oral communications such as those alleged by the Smiths constitute a plan. SeeDeibler, 973 F.2d at 209, Henglein v. Informal Plan For Plant Shutdown Benefits, 974 F.2d 391, 399-400 (3d Cir.1992). Under that test, "a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." Donovan, 688 F.2d at 1373. In Donovan, a series of employers subscribed to a multiple employer trust which provided insurance through the purchase of commercial policies which themselves laid out details regarding benefits and eligibility. Additionally, there were participation agreements signed by employees and employers indicating who subscribed to the trust and making clear the subscribers financed the trust. 688 F.2d at 1373-74. The district court noted no such similar documents existed here. The court also observed that unlike the Transition Provision, which referred internally to a pre-existing plan, the Donovan trust did not replace an existing plan.
 
 
 17
 We agree the Hospital's oral and written representations did not constitute an informal plan. Construed in the light most favorable to the Smiths, the Transition Provision was an "act ... that record[ed]" a "decision to extend certain benefits." Donovan, 688 F.2d at 1373. Although Donovan stated such acts can be "direct or circumstantial evidence" of a plan, they are not in themselves a plan. Id. Moreover, as the district court noted, the force of this evidence, and of the Smiths' claim, is undercut by the Transition Provision's reference to another pre-existing plan. Finally, the Transition Provision contains conflicting statements regarding two of the Donovan factors--the class of benefits and the class of beneficiaries. In one paragraph, it limits employees "disabled on 12/1/86" to benefits under the old plan or the new plan, whichever is less; in the following paragraph, it provides "currently disabled" employees with coverage under the old plan.[3]
 
 
 18
 Moreover, we believe characterization of the Transition Provision and the oral representations as a "plan" would be contrary to ERISA. As we pointed out in Hozier v. Midwest Fasteners, Inc., 908 F.2d 1155 (3d Cir.1990), ERISA does not require employers to establish benefit plans and does not subject welfare benefit plans to the vesting requirements it imposes on pension plans because "Congress ... balance[d] its desire to regulate extant plans more extensively against the danger that increased regulation would deter employers from creating such plans in the first place." Id. at 1160. Consistent with this concern, the Second Circuit has observed that a rule requiring "all communications between an employer and plan beneficiaries to be considered along with summary plan descriptions as establishing a plan," would diminish "[p]redictability as to the extent of future obligations ... and [create] substantial disincentives for even offering such plans." Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir.1988). For these reasons, we believe the district court correctly concluded the oral representations and the Transition Provision did not constituted an "employee benefit plan" enforceable under Sec. 502(a)(1)(B).[4]C.
 
 
 19
 We turn next to the Smiths' claim that the representations give rise to an equitable estoppel claim under ERISA. Section 502(a)(3) of ERISA permits a beneficiary "to obtain ... appropriate equitable relief ... to redress [ERISA] violations or ... to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. Sec. 1132(a)(3). We have held this section permits an ERISA beneficiary to recover benefits under an equitable estoppel theory, upon establishing a material representation, reasonable and detrimental reliance upon the representation, and "extraordinary circumstances." Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir.1991).
 
 
 20
 The district court assumed the Transition Provision and hospital personnel director North's oral assurances to Mr. Smith of continued coverage constituted actionable misrepresentations, and assumed Mr. Smith reasonably relied upon them. We agree with these assumptions, which defendants do not dispute. But the court nonetheless rejected the Smiths' estoppel claim on the ground they had not created a genuine issue of material fact that they sustained injury as a result of the misrepresentations, i.e., that their reliance was detrimental.
 
 
 21
 To establish injury, the Smiths must show they could have obtained an alternative health insurance policy that provided coverage for Mrs. Smith's nursing care were it not for the Hospital's misrepresentations. In the district court, the Smiths advanced three theories of injury. They contended that absent the misrepresentations, (1) they could have converted to an individual Blue Cross/Blue Shield policy under the conversion provision of the Rehab Hospital's group policy, (2) they could have shopped for alternative coverage, or (3) Mr. Smith, who was unemployed at the time, could have looked for a job providing the necessary coverage.
 
 
 22
 The district court rejected the second and third theories on the ground the Smiths produced no evidence that they could have purchased alternative coverage. We agree the Smiths' conclusory allegations that they could have obtained alternative coverage, without more, were insufficient to withstand summary judgment. Fed.R.Civ.P. 56(e); Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp., 812 F.2d 141, 142 (3d Cir.1987).
 
 
 23
 More substantial is the Smiths' contention that were it not for the Hospital's misrepresentations, they could have converted to an individual Blue Cross/Blue Shield policy in order to retain the skilled nursing care coverage provided by Blue Cross/Blue Shield. The district court recognized the group policy contained a conversion provision, but believed it inapplicable to the Smiths' situation.
 
 
 24
 To assess this determination, we look first to the terms of the Blue Cross/Blue Shield policy. The policy provides in part:
 
 
 25
 If you leave the employ of the Hospital, due to termination of employment, layoff, disability or leave of absence, Blue Cross/Blue Shield, Blue Shield and Major Medical coverage may be continued by converting to a Direct-Pay Subscription Agreement.[5]
 
 
 26
 The policy also provides that a subscriber entitled to conversion must exercise this right within thirty days of leaving the employ. A separate clause of the policy provides: "[t]he conversion privilege is not available if the Group cancels coverage in favor of group coverage by another organization," and what appears to be a subsequent version of that clause states: "[t]he conversion privilege is not available if the Group cancels coverage in favor of Group coverage by another insurer."[6]
 
 
 27
 These provisions reveal that the Smiths' conversion right, and hence their equitable estoppel claim, hinges on two critical questions: when Mrs. Smith left "the employ" of the Rehab Hospital, and, assuming she did not leave "the employ" of the Hospital until the time it switched plans, whether she was nonetheless barred from converting because the Hospital's change to the self-insured VEBA Plan constituted group coverage "by another organization" or "by another insurer."
 
 
 28
 The district court focused only on the second of these questions, ruling the Smiths could not have converted to an individual policy because "the occasion for Smith's loss of Blue Cross/Blue Shield coverage was not that she left the employ of the Rehab Hospital due to disability," but "that her former plan was cancelled in favor of another." Defendants contend alternatively that Mrs. Smith left the "employ" upon becoming disabled in August 1985, and that her conversion right expired thirty days later. The Smiths maintain Nancy Smith remained in the "employ" until at least December 3, 1986 and that the VEBA Plan did not constitute a plan of "another organization" or "another insurer" within the meaning of the policy.
 
 
 29
 As we read the policy, the Smiths must prevail on both grounds to obtain coverage because the two conditions operate independently; a person is barred from converting either if she has left the employ and the thirty-day conversion period has elapsed, or if she has remained in the employ and the employer opts for coverage by "another organization" or "another insurer." Resolution of this dispute therefore turns on the proper interpretation of the term "the employ" and the phrases "another organization" and "another insurer."
 
 
 30
 (1)
 
 
 31
 We consider first the meaning of the term "the employ." We do not share defendants' apparent certitude about the meaning of this term. Neither the Blue Cross/Blue Shield Pamphlet nor the Summary Plan Description nor any other plan document in the record defines "the employ." Nor does the conversion provision state that an employee such as Mrs. Smith who suffers a "disability" automatically leaves the employ. It provides that a disability is one of four events, along with termination, layoff, or leave of absence, that can be the basis for leaving the employ. But it does not provide that occurrence of one of these events necessarily causes one to leave the employ. Nor do these events help us define "the employ" because they do not fall neatly into one category. A leave of absence is typically temporary, a layoff or a disability can be either temporary or permanent, and a termination is permanent.
 
 
 32
 We believe the term "the employ" is ambiguous. It could either refer only to active workers, as defendants apparently believe, or include certain disabled workers who continue to receive benefits, as the Smiths contend. In contending Mrs. Smith left the employ at or about the time of the disability, defendants urge us to conclude that only active workers are in "the employ." The Smiths disagree, maintaining she remained in "the employ" at the time the Hospital changed plans on December 1, 1986.
 
 
 33
 To choose between these competing meanings, we can consider extrinsic evidence of the parties' understanding of that term. Taylor v. Continental Group Change in Control Severance Pay Plan, 933 F.2d 1227, 1232 (3d Cir.1991). An important source of such evidence is the parties' performance of the agreement. Langer v. Monarch Life Ins. Co., 879 F.2d 75, 81 (3d Cir.1989). Evidence of the parties' performance can also demonstrate a latent ambiguity in the contract, id., which itself is a basis upon which to deny summary judgment. Taylor, 933 F.2d at 1232 (reversing summary judgment in light of ambiguous ERISA plan provision).
 
 
 34
 The record contains abundant evidence that, even after Mrs. Smith suffered the cerebral hemorrhage, the Hospital treated her in important respects as an employee. It is undisputed the Hospital continued to pay Mrs. Smith's health insurance premiums--and Blue Cross/Blue Shield continued to provide her with coverage--until the Hospital switched plans on December 1, 1986, when it offered her the opportunity to enroll in its self-insured plan. Indeed, the Hospital continued to provide coverage to Mrs. Smith under the VEBA Plan until April 7, 1988.
 
 
 35
 As a general matter, an individual's receipt of fringe benefits can be evidence of his status as an active employee. De Jesus v. General Motors Acceptance Corp., 645 F.Supp. 146, 149 (D.P.R.1986) (granting summary judgment to employee in ERISA action by relying on evidence he received sick leave benefits in support of finding he was "at work" within the meaning of benefits plan). Moreover, only employees were eligible for coverage under both the Blue Cross/Blue Shield Policy, App. 760-61, and the VEBA Plan, App. 507, 822. Indeed, the representations forming the basis for this lawsuit were made to Joseph Smith at a seminar held for employees regarding the change in coverage.[7]
 
 
 36
 Defendants maintain there is no evidence that the Smiths could have relied on the Hospital's continued payment of benefits because the Blue Cross/Blue Shield pamphlet "specifically and unambiguously advised Mrs. Smith of her right to convert coverage if she left the employ of the Hospital due to 'termination of employment' or 'disability.' " But this contention assumes "the employ" unambiguously refers to active workers, an interpretation we do not believe can be established at this point as a matter of law. Defendants also ignore the Hospital's persistent course of conduct between August 1985 and December 1986, when it continued to pay the Smiths' health insurance premiums and re-enrolled her in its new plan, which supports the Smiths' interpretation of "the employ."[8]
 
 
 37
 Accordingly, we believe a factfinder could find Mrs. Smith remained in the employ of the Hospital until December 3, 1986, the date she enrolled in the VEBA Plan.[9] It could also find the Smiths reasonably and detrimentally relied on the Hospital's continued payment of their insurance premiums rather than seeking other insurance that would cover Mrs. Smith's skilled nursing care.[10]
 
 
 38
 We cannot agree with the dissent's conclusion that, as a matter of law, Mrs. Smith could not have been in "the employ" after suffering her hemorrhage in August 1985. The dissent concedes " 'the employ' ... is broad enough to cover some inactive participants along with active employees," but insists Mrs. Smith is not one of the covered "inactive participants." We recognize the policy could have been drafted to terminate coverage, and thereby trigger the thirty-day conversion right, whenever an employee suffers a disability which leaves her with no prospect of reemployment. But given the ambiguous policy language and the considerable evidence supporting the conclusion that the Hospital believed Mrs. Smith remained in "the employ" after her hemorrhage, we believe the dissent's construction runs afoul of accepted principles of insurance contract interpretation, ERISA's pro-worker underpinning, and our obligation to reverse summary judgment where there is a genuine issue of material fact, Fed.R.Civ.P. 56(c), and to draw all inferences in favor of the non-movant. J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir.1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991). Thus, our recognition of the Smiths' estoppel claim is not an effort to "amend" a plan outside the scope of Sec. 502(a)(3) of ERISA.[11]
 
 
 39
 (2)
 
 
 40
 Even assuming Mrs. Smith remained in the employ at the time of the changeover in plans, she might still have been barred from converting if the Hospital's switch to the VEBA Plan constituted group coverage "by another organization" or "by another insurer." Again, the policy does not define the operative phrases "another organization" or "another insurer." The district court apparently believed any other insurance arrangement entered into by the Hospital would fall within these terms, as it rejected the Smiths' claim for the sole reason "that [Mrs. Smith's] former plan was cancelled in favor of another." But we believe it is not clear that a change in coverage to a self-insured plan constitutes coverage by "another organization" and find it even less likely that such a change could qualify as coverage by "another insurer."
 
 
 41
 Because these phrases are ambiguous, two questions must be explored on remand. First, which of the two versions of the policy--the one containing the words "another organization" or the one containing the words "another insurer"--was in force in December 1986, the time when the Smiths contend their conversion right attached. Second, what is the meaning of the applicable phrase--"another organization" or "another insurer."
 
 
 42
 The ambiguities in the terms of the Blue Cross/Blue Shield policy and the other facts of this case underscore the advisability for employers to provide full and timely disclosure of their plans via Summary Plan Descriptions. Such disclosure would further ERISA's stated policy "to protect ... the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto...." 29 U.S.C. Sec. 1001(b). Prompt and accurate disclosure of the terms of the VEBA Plan to the Smiths could have prevented this dispute.[12] Were we to construe these ambiguous terms against the Smiths on summary judgment absent such disclosure, we would be holding an insured to constructive knowledge of an insurer's unfavorable post-hoc interpretation of the insured's rights. Such a result would frustrate accepted principles of insurance contract interpretation and the central goals of ERISA.
 
 
 43
 For these reasons, we will reverse the district court's grant of summary judgment in favor of the Hospital on the Smiths' estoppel claim, and remand for further proceedings on this claim. We will affirm summary judgment for the remaining defendants.[13]IV.
 
 
 44
 To summarize, there are two principal questions on remand: when Nancy Smith left "the employ" of the Hospital, and whether the Hospital's change to the self-insured VEBA Plan constituted group coverage by "another organization" or "another insurer." Relevant to determining when Smith left the Hospital's "employ" are the effect of the Hospital's continued payment of Mrs. Smith's health insurance premiums, as well as whether the Hospital believed she remained in the employ although she was not then working. Whatever the Hospital's belief, it must be weighed against the Smiths' reasonable understanding of the term "the employ." Where, as here, "it does not appear that the [VEBA Plan] was the product of explicit bargaining, ... the reasonable understanding of the beneficiaries, as well as the intent of the employer, may be admissible to clarify ambiguities." Taylor, 933 F.2d at 1232 (finding such evidence admissible to define term "successor" in severance pay agreement). Cf.Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 540 (9th Cir.1990) (adopting contra proferentum in ERISA cases because insurance policies "are almost always drafted by specialists employed by the insurer"), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990). A similar inquiry will help determine the Hospital's intent regarding the phrase "another organization" or the phrase "another insurer"--depending on which of the versions of the policy is determined to have been in force in December 1986--and the Smiths' reasonable understanding of the relevant phrase, to determine whether the self-insured VEBA Plan fell within that phrase.
 
 
 45
 In the event the Smiths did have a conversion right and therefore suffered injury in reliance on the Hospital's representations, they also must establish the "extraordinary circumstances" necessary for an estoppel claim. Rosen v. Hotel and Restaurant Employees & Bartenders Union, 637 F.2d 592, 598 (3d Cir.) (finding such circumstances established), cert. denied, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). On the record before us, we believe a factfinder could find such circumstances are established, in light of the Hospital's repeated oral and written misrepresentations to Joseph Smith, his diligence in attempting to obtain accurate answers regarding his wife's coverage, as evidenced by his persistent questioning of Ms. North and Hartford Insurance personnel, and the immense coverage expenses at stake. We recognize of course that additional facts may be developed and we take no position on the ultimate determination.
 
 V.
 
 46
 For the foregoing reasons, the order of the district court is affirmed in part and reversed in part and remanded.
 
 
 47
 HUTCHINSON, Circuit Judge, dissenting.
 
 
 48
 I agree with the reasoning of the Court in Parts I, II and III A. and B. of its opinion, but I disagree with Part III C. and respectfully dissent from its order vacating the district court's grant of summary judgment in favor of the Rehab Hospital. To reach that decision, the Court, in Part III C. of its opinion, relies on the Smiths' theory that Sec. 502(a)(3) of ERISA applies to this case and may permit them to recover on a theory of equitable estoppel. Section 502(a)(3) provides:
 
 
 49
 (a) Persons empowered to bring a civil action. A civil action may be brought--
 
 
 50
 . . . . .
 
 
 51
 (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan
 
 
 52
 ....
 
 
 53
 29 U.S.C.A. Sec. 1132(a)(3) (West 1985). I believe Sec. 502(a)(3) has no application to this case because the Smiths seek to modify or amend the Plan, not to enforce it. Moreover, even if the statute did permit the use of equitable estoppel for the purpose of changing the terms of a plan, I believe that the Smiths have not pointed to any evidence in this record that would show all the traditional common law elements of equitable estoppel let alone the extraordinary circumstances this Court has previously indicated ERISA requires. Therefore, I would affirm.
 
 
 54
 The Smiths base their estoppel theory on the Hospital's December 1986 misrepresentation that Mrs. Smith would receive the same extended coverage under the self-insured group plan the Hospital was then about to adopt that she had been entitled to receive under the old Blue Cross/Blue Shield group plan so long as she was a person in the "employ of the group." The Court concludes that the word "employ" is so ambiguous that it includes a person who has been totally disabled and comatose, without any reasonable prospect of recovery, for a year and three months. This record shows beyond contradiction that it was apparent soon after Mrs. Smith suffered her stroke that she would never be able to return to work at the Hospital. I do not think the meaning of the word "employ" can be stretched that far. Proof of continuing employment is an essential element of the estoppel Mrs. Smith seeks to impose because the opportunity to convert to a direct pay subscription, the opportunity she claims to have lost, had to be made within thirty days of the time it became apparent that her disability would preclude her return to work under the old Blue Cross/Blue Shield plan.
 
 
 55
 I recognize that the phrase "the employ," as used in the old plan, is broad enough to cover some inactive participants along with active employees, but the abstract possibility that some disabled employees will recover and return to work does not create a genuine issue of material fact about Mrs. Smith's continued employment[1] for purposes of the Plan in December 1986 when the Hospital's misrepresentations about continued coverage were made to her husband.[2]
 
 
 56
 The Smiths never contended in the district court that Mrs. Smith was an employee at any time after her stroke. Mr. Smith admitted in his deposition that his wife's medical status negated an employment relationship at any time after her injury. When asked how long Mrs. Smith was "employed" by the Hospital, he responded, "until she was sick" and "she has not returned to employment" since. Appendix ("App.") at 604. When asked whether she continued to work at the time of the changeover in plans, one year and four months after suffering the stroke, he replied, "No, she was in a coma." Id. at 607. Mr. Smith also said he "believes her disability is permanent and that she will probably never be able to live at home." Id. at 190.
 
 
 57
 Accordingly, I am unable to see any genuine dispute of fact over whether Mrs. Smith was still in "the employ" of the Hospital when the December 1986 misrepresentations about coverage under the new self-insured plan were made. Unless the Hospital is also estopped from denying that Mrs. Smith was still in its employ in December 1986, its argument that the Smiths could not have detrimentally relied on Mrs. North's December 1986 misrepresentation about continuing coverage under the new self-insured plan defeats the Smiths' theory of equitable estoppel, even at common law. The misrepresentation Mrs. North made about continuing coverage under the new plan caused Mrs. Smith no harm. It was already much too late for her to take advantage of the opportunity to convert to direct payment that she contends she lost in reliance on Mrs. North's misrepresentation.
 
 
 58
 Recognizing this problem, the Court holds alternately that certain acts of the Hospital which indicated that Mrs. Smith was still in the employ of the group may give rise to the extraordinary circumstances we have said are necessary to create an equitable estoppel under Sec. 502(a)(3) of ERISA. SeeHozier v. Midwest Fasteners, Inc., 908 F.2d 1155, 1165 n. 10 (3d Cir.1990). Those actions include: (1) the Hospital's failure to notify Mrs. Smith that she had been terminated; (2) its act of sending her a memo addressed to "Employees with Hartford Medical/Dental Coverage" on November 8, 1989, long after she became disabled; (3) the oral representations Mrs. North made at the December 1986 employee meeting which Mr. Smith attended; (4) the Hospital's act of furnishing Mr. Smith with a written Transition Provision that ambiguously stated in one provision that persons already receiving benefits under the old plan would not be adversely affected by conversion to the new plan but in another provision indicated that only the more restricted benefits of the new plan would be available, see App. at 35; and (5) the Hospital's continued remittance of group premiums to Blue Cross/Blue Shield on Mrs. Smith's behalf. Mrs. Smith, however, was only one participant in the Plan. Others had an interest. The misleading acts of the Hospital with respect to a single participant cannot adversely affect the other participants or define the meaning of the Plan for them.[3] Thus, because this is not a simple bilateral contract between two parties, the act that is perhaps most significant is the continued remittance of premiums to Blue Cross/Blue Shield on Mrs. Smith's behalf at group rates. This continued from the time of Mrs. Smith's stroke on August 27, 1985 until the Hospital's changeover to the new plan in December 1986. In Hozier, we recognized that continued acceptance of a participant's contributions to a benefit plan may be one of the extraordinary circumstances necessary to create an ERISA estoppel under Sec. 502(a). SeeHozier, 908 F.2d at 1165 n. 10 (citing Rosen v. Hotel & Restaurant Employees & Bartenders Union, 637 F.2d 592, 598 (3d Cir.1981)). Continuing payment of premiums or contributions is an obvious necessity if the plan is to remain sound and the rights of other participants to remain secure. Still, I do not think the other acts Mrs. Smith relies on, even when coupled with the continued contributions, create an estoppel under ERISA Sec. 502(a).
 
 
 59
 The benefits pamphlet and the Blue Cross/Blue Shield contract constitute the only evidence before us concerning the terms of the old Blue Cross/Blue Shield plan. The benefits pamphlet provides:
 
 
 60
 If you leave the employ of the Hospital, due to termination of employment, layoff, disability or leave of absence, Blue Cross, Blue Shield and Major Medical coverage may be continued by converting to a Direct-Pay Subscription Agreement.
 
 
 61
 App. at 809 (emphasis added). The Blue Cross/Blue Shield contract provides:
 
 
 62
 1. If coverage of a Subscriber is terminated solely because of leaving the employ of the Group while this Contract is in effect, he or she may apply directly within 30 days of the termination to Blue Cross for the applicable Contract issued to direct payment Subscribers under its regulations and at its established charges.
 
 
 63
 App. at 781 (emphasis added).
 
 
 64
 This is not a case like Langer v. Monarch Life Insurance Co., 879 F.2d 75 (3d Cir.1989), where ambiguous terms of an agreement are defined by the parties' course of conduct in carrying it out. As already stated, some abstract ambiguity about the status of a disabled person who has some likelihood of recovery as an employee participant in a benefit plan is not material to Mrs. Smith's case. Her disability was total and permanent from its onset.
 
 
 65
 Section 502(a)(3) states a court may use equitable principles to "enforce" the provisions of a plan.[4] Here, the use of equitable estoppel to preclude the Hospital from denying Mrs. Smith's continued employment would amend, rather than enforce, the provision of the old Blue Cross/Blue Shield benefit plan that required a participant who ceased to be in "the employ of the group" to convert to direct-pay within thirty days of termination "due to disability." Cf.Rodrigue v. Western & Southern Life Ins. Co., 948 F.2d 969, 971 (5th Cir.1991) (rejecting equitable estoppel based on oral representations because express terms of plan control); Cummings v. Briggs & Stratton Retirement Plan, 797 F.2d 383, 389 (7th Cir.), cert. denied, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 703 (1986); see alsoStraub v. Western Union Tel. Co., 851 F.2d 1262 (10th Cir.1988); Nachwalter v. Christie, 805 F.2d 956 (11th Cir.1986).
 
 
 66
 Even if equitable estoppel were available to modify the terms of this plan, at trial the Smiths would have the burden of showing all the necessary elements of an estoppel. Thus, the Hospital could not be estopped from denying Mrs. Smith's continued employment unless she has shown that she reasonably relied on the actions that she says caused her to believe she was still in the "employ of the group" in December 1986. There is no evidence in this record showing the Smiths can meet that burden.
 
 
 67
 Mr. Smith's assessment of his wife's prognosis immediately after she suffered her stroke in August 1985, coupled with the quoted language in the March 1985 explanatory pamphlet Blue Cross/Blue Shield had issued to Rehab Hospital group members, advised the Smiths that Mrs. Smith's group benefits were in jeopardy and that she needed to take action within thirty days to retain coverage. The explanatory pamphlet put Mr. Smith on notice that his wife's group coverage ended when it became apparent that her disability permanently precluded her from returning to work.
 
 
 68
 There is no evidence of any inquiry by Mr. Smith, between August 1985 when his wife became ill and the day in December 1986 when he says Mrs. North misled him, about who authorized the payment of group premiums on his wife's behalf, or their source. There is likewise no evidence that Blue Cross/Blue Shield knew of Mrs. Smith's longstanding total disability. Unless the old plan's limited conversion privilege is meaningless, Blue Cross/Blue Shield was not obligated to continue benefits unless a timely conversion were made and the premiums applicable to an individual direct-pay plan were paid.[5] If Blue Cross/Blue Shield, the insurers under the old plan, were not obligated to continue Mrs. Smith's coverage at group rates, there does not seem to be any basis for supposing that it would have done so if it had been aware that Mrs. Smith was no longer a member of the group.
 
 
 69
 In any event, an estoppel grounded in reliance on continued group coverage in this case seems to me to amend, rather than enforce, the Hospital's old plan. Because the estoppel the Smiths seek to create eliminates the need to convert to direct-pay within thirty days of termination, and the evidence shows Mrs. Smith no longer could be considered an employee of the group, it is not among the purposes for which Sec. 502(a)(3) authorizes courts to resort to equitable principles.
 
 
 70
 I am unable to close this dissent, however, without commenting on the impact that termination of the Blue Cross/Blue Shield extended care benefit has on the Smiths and others like them.[6] The feeling of unfairness is palpable. Hopefully, it will not be beyond the power of the courts and Congress to dispel that sense of injustice despite the limitations ERISA puts on the techniques the common law would employ to adjust rigid rules to particular situations. Logic may be the law's tool but its heart is justice, and the public's demand for concrete justice will not be contained by the straitjacket of inflexible rules. Thus, in any contract of insurance or indemnity, an insurer's ability to avoid performance after a risk becomes reality makes the promisor's covenant to indemnify the promisee against the risk illusory. Cf.Armistead v. Vernitron Corp., 944 F.2d 1287, 1296 (6th Cir.1991) (absent clause in agreement permitting plan's termination, court would not read one into the agreement because to do so would render illusory the employer's promise to provide after retirement insurance benefits).
 
 
 71
 An employer's promise to pay the cost of medical care for its employees is illusory if an employer can unilaterally eliminate or reduce benefits. The employer is then relieved of its promise of indemnity just when indemnity is most needed, and the employee in need of care is deprived of part of what he worked to get. For the employee, there is no quid pro quo. When benefits are thus reduced or snatched away, the promises those employees thought their employers had made to them disappear. Some courts have, nevertheless, held that a self-insured employer can amend or terminate a benefits plan in a way that relieves an employer, in whole or in part, of its promise of indemnity to employees who have already suffered covered disabilities. See, e.g.,McGann v. H & H Music Co., 946 F.2d 401 (5th Cir.1991) (allowing employer, in ERISA Sec. 510 discrimination action, to reduce maximum welfare benefit for AIDS after participant became ill because ERISA does not vest rights in welfare benefit plans), cert. denied, --- U.S. ----, 113 S.Ct. 482, 121 L.Ed.2d 387 (1992); In re White Farm Equip. Co., 788 F.2d 1186, 1192-93 (6th Cir.1986). The rationale of these decisions needs examination. Congress's intent of avoiding vesting of rights in benefit plans may deprive participants of rights under the law of property, but it is not necessarily inconsistent with the existence of rights under the law of contracts. Unfortunately, I think we are unable to reach or consider that issue in this case. Mrs. Smith did not raise the question whether benefits could be terminated after she became disabled until her motion for reconsideration of the district court's order granting summary judgment. Moreover, even if this question of whether the Hospital's promise to her was illusory had been raised earlier, or could be otherwise considered on this appeal, Mrs. Smith's failure to convert to direct-pay would still be likely to preclude recovery because her right to convert, though limited in time, would seem to take the promise of extended care out of the class of promises that are wholly illusory. The conversion requirement is common in both insured and self-insured group plans for health and disability, and the law has long tolerated provisions requiring persons covered by a group insurance policy to convert to direct pay within a limited time after they leave the group. SeeGuardian, 479 A.2d at 952, n. 7.
 
 
 72
 The Smiths present a hard case. It is regrettable that neither this Court nor the district court has been able to address directly the illusory promise issue that a restrictive change in an ERISA health care plan presents when a reduction in benefits incident to the adoption of a new plan is applied to disabled participants after they are already receiving benefits under the plan in existence when they became sick and disabled.
 
 
 73
 Nevertheless, I would affirm the district court's order granting summary judgment in favor of the Hospital because Mrs. Smith had lost her right to convert to direct-pay at the time of the changeover in plans.[7]
 
 
 
 *
 The Honorable William L. Standish, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 ERISA's civil enforcement provision gives exclusive subject matter jurisdiction over such actions to federal district courts, 29 U.S.C. Sec. 1132(e)
 
 
 [2]
 The Smiths moved for reconsideration, asserting two new theories, a common law contract right to benefits, and a claim that the court's grant of summary judgment constituted an unconstitutional taking of their property. The district court denied the motion, ruling that since the Smiths produced no new evidence and did not establish an intervening change in the law, they could not assert these arguments for the first time on a motion to reconsider
 
 
 [3]
 Additionally, the Smiths' claim is significantly weaker than the claims in Henglein and Deibler, two recent cases in which we applied the Donovan test to informal plans. In Deibler, we found an informal union severance pay plan established by relying on the minutes of a union meeting stating the union's intent to institute severance payments of one week's salary for each year of service, and on the fact that four union officers applied for and received severance over a two-year period until the union terminated the policy. 973 F.2d at 210. In Henglein, we relied on similar company memoranda distributed over a period of years to vacate and remand a district court's judgment that no informal severance plan had been established. 974 F.2d at 401-02. The Smiths have offered no similar documentation of an informal plan here
 
 
 [4]
 The district court also held the oral representations and the Transition Provision did not constitute an informal plan because they failed to contain many of the twelve categories of information ERISA requires for a summary plan description, see 29 U.S.C. Sec. 1022(b). It relied on our decision in Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1315-18 (3d Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2856, 115 L.Ed.2d 1023 (1991), which employed a similar analysis to reject a claim for benefits. We do not believe Gridley necessarily controls because there we considered whether a summary plan description had been created, whereas here we consider the distinct question whether an informal plan was created. SeeGridley, 924 F.2d at 1310. Accordingly, our cases in Henglein and Deibler, applying the Eleventh Circuit's Donovan test, provide the applicable precedents
 
 
 [5]
 Neither party has been able to produce a copy of the policy in effect on August 27, 1985, and therefore the provision set forth in the text is drawn from a March 1985 "explanation of benefits" pamphlet Blue Cross/Blue Shield issued to the Rehab Hospital subscribers. App. 809. The parties agree this provision contains the operative language regarding whether Nancy Smith was in the employ
 
 
 [6]
 Because the second version of the policy contains a clause stating the policy "supersedes all prior contracts existing between the parties," we would ordinarily conclude the operative phrase is the term "another insurer" rather than "another organization." But the record is in such a state that we are unable to determine whether the policy containing the words "another insurer" is in fact a later version of the policy. The version of the policy using the phrase "another organization," App. 781, appears to bear the effective date February 1, 1984, App. 775, while the version of the policy using the phrase "another insurer," Supp.App. 54, appears to be an attachment to a revision of that contract dated September 7, 1984, Supp.App. 42. Accordingly, we will analyze the effect of both versions of this clause on the Smiths' claim
 
 
 [7]
 Additional documentary evidence of Smith's continued status as an employee after her hemorrhage appears in Exhibit J to her Second Amended Complaint, a memo dated November 8, 1989. App. 44. The Smiths' receipt of this memo, coupled with the fact it was addressed only to "Employees with Hartford Medical/Dental Coverage," suggests she remained an employee as late as November 1989. Additionally, Exhibit 5 to Rehab Hospital Administrative Committee member Sandra Smith's deposition, a handwritten memo from Smith to Hartford Claims Processor Sharon Downs, dated November 17, 1987, refers to Nancy Smith as an "employee." App. 357
 
 
 [8]
 We do not, as the dissent suggests, "hold[ ] alternately that [the Hospital's] acts may give rise to the extraordinary circumstances" required for an estoppel claim, typescript at 24. Rather, the Hospital's acts, as evidence of a party's performance of a contract, aid in our interpretation of the meaning of the contractual term "the employ," which in turn determines whether the Smiths can establish the injury necessary for their estoppel claim
 Additionally, we note the policy provides skilled nursing care coverage up to $1 million. Because only employees are eligible for coverage, the policy contemplates some individuals remain in "the employ" despite incurring $1 million in skilled nursing care--more than Mrs. Smith received during the fifteen months she was covered by the Blue Cross/Blue Shield policy.
 
 
 [9]
 Adopting the Smiths' broader interpretation of "the employ" would comport with the principle of contra proferentum, under which courts construe ambiguous terms in insurance policies in favor of the insured. We recently joined several other circuits in adopting contra proferentum as a federal common law rule in ERISA insurance cases. Heasley v. Belden & Blake Corp., 2 F.3d 1249, 1257-58 (3d Cir.1993) (citing cases from other circuits). As we explained in Heasley, contra proferentum recognizes insurance policies " 'are almost always drafted by specialists employed by the insurer, [who] should be expected to set forth any limitations on its liability clearly enough for a common layperson to understand; if it fails to do this, it should not be allowed to take advantage of the very ambiguities that it could have prevented with greater diligence.' " Heasley, 2 F.3d at 1257 (quoting Kunin v. Benefit Trust Life Ins. Co., 910 F.2d 534, 540 (9th Cir.), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990)). Additionally, "[t]his reasoning is especially convincing where ... an insured employee seeks contractual benefits under ERISA, a statute designed to protect the interests of such employees." Id. These rationales apply here as well. But we do not believe it appropriate to employ contra proferentum to decide this case in the Smiths' favor at this time because that doctrine should be used only if normal principles of contract construction are unavailing. Heasley, 2 F.3d at 1257. Consideration of extrinsic evidence to resolve ambiguities is one such principle. And we believe it appropriate for the district court in the first instance to weigh the extrinsic evidence here
 
 
 [10]
 The Smiths' estoppel claim, and particularly the reasonableness of their reliance, became especially compelling after June 1986, when the Plan incorporated the newly-enacted Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) amendments to ERISA, 29 U.S.C. Secs. 1161-68 (1988). These amendments, adopted out of "concern[ ] with reports of the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay." H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986 U.S.Code Cong. & Admin.News 42, 579, 622, require private employers who offer group health insurance plans to notify employees in advance of any loss of health coverage due to any of several qualifying events, including termination of employment or disability. 29 U.S.C. Sec. 1163(2), (4). The dissent's observation that our decision grants relief "beyond COBRA" because COBRA requires only eighteen months of continued group coverage after termination of employment is beside the point. COBRA does not purport to be the exclusive source of relief for employees seeking coverage. In particular, nothing in COBRA indicates it has displaced the federal common law equitable estoppel claim under ERISA, a claim we recognized both before COBRA's enactment, Rosen v. Hotel & Restaurant Employees & Bartenders Union, 637 F.2d 592, 598 (3d Cir.1981), cert. denied, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981), and since COBRA's enactment, Hozier, 908 F.2d at 1165 n. 10
 
 
 [11]
 In concluding Mrs. Smith could not have been in "the employ" after her hemorrhage, the dissent focuses chiefly on Mr. Smith's deposition testimony that Mrs. Smith did not return to work after her hemorrhage, an undisputed fact. But this testimony, without more, is not an admission that Mrs. Smith's medical condition "negated an employment relationship at any time after her injury." Dissent at 143. Mr. Smith's testimony does not represent a legal opinion on the proper interpretation and application of the policy. At most, the testimony, coupled with evidence of the Hospital's acts, creates a dispute of fact to be resolved at trial
 
 
 [12]
 We note that neither the Hospital nor the Plan Administrator gave the Smiths a copy of the summary plan description of the VEBA Plan or a copy of the Plan itself until four or five months after they enrolled. This violated ERISA's requirement that plan administrators must furnish "a copy of the summary plan description" to plan participants within ninety days. 29 U.S.C. Sec. 1024(b)(1)(A)
 
 
 [13]
 We reverse only as to the Hospital because the Smiths assert rights under the old Blue Cross/Blue Shield Plan rather than under the new VEBA Plan, and because the critical misrepresentations--the oral misrepresentations made by North in December 1986--were made to Mr. Smith by employees of the Rehab Hospital rather than the VEBA Plan or its Administrative Committee, who are the remaining defendants. Although we recognize the Hospital cannot be liable under ERISA simply by virtue of its status as Mrs. Smith's employer or its decision to change plans, Payonk v. HMW Industries, Inc., 883 F.2d 221, 225 (3d Cir.1989), it can be liable to the extent it acted as a fiduciary of the plan, Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133-34 (3d Cir.1993). In Fischer, we held an employer can be liable under ERISA in his fiduciary capacity both on breach of fiduciary duty and equitable estoppel theories for affirmative misrepresentations such as those made by North here. See alsoEddy v. Colonial Life Ins. Co. of America, 919 F.2d 747, 750-51 (D.C.Cir.1990) (misrepresentation to employee requiring conversion rights under health insurance plan gives rise to breach of fiduciary duty claim under ERISA). ERISA broadly defines a fiduciary as any person who "exercises any discretionary authority or discretionary control respecting management of such plan ... or has any discretionary authority ... in the responsibility in the administration of the plan." 29 U.S.C. Sec. 1002(21)(A). We believe, in the circumstances of this case, the Hospital acted as a fiduciary of the VEBA Plan, and that in this capacity, it can be liable on an equitable estoppel claim under Sec. 502(a)(3). We do not believe this case implicates concerns regarding the actuarial soundness of an ERISA plan that have discouraged courts from recognizing estoppel claims, because we hold the employer, not the Plan, is liable, and the employer need not satisfy any liabilities out of the Plan. Bogue v. Ampex Corp., 750 F.Supp. 424, 430 (N.D.Cal.1990) (recognizing estoppel claim "because recovery against the employer who is not the administrator would not diminish the fund"), aff'd, 976 F.2d 1319 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993). Nor do we believe the self-funded nature of the Plan should be a basis to allow the employer to avoid liability
 
 
 [1]
 "Employed" is defined as "the act of doing a thing and the being under contract or orders to do it." Black's Law Dictionary 471 (5th ed. 1979). "Employment" is defined as "[a]ctivity in which person engages or is employed; normally, on a day-to-day basis." Id. "The state of fact of being employed; esp. that of serving an employer for wages." Oxford English Dictionary 129 n. 2 (Compact ed. 1981). Because Mrs. Smith has no prospect of reemployment, she no longer meets any of these definitions
 
 
 [2]
 Similarly, the COBRA amendments with their requirement of express notice of termination do not help Mrs. Smith because she was no longer in "the employ of the group" when these amendments became effective on July 1, 1986, more than ten months after Mrs. Smith suffered her disabling stroke and could no longer return to work. Because COBRA was not in effect when Mrs. Smith lost all prospect of returning to work, I think its notice and continuing coverage requirements are inapplicable to this case. If COBRA were applicable, it would have required not only notice of termination of employment but also continuing coverage for eighteen months for plan years beginning on or after July 1, 1986. 29 U.S.C.A. Secs. 1161, 1162(2), 1163(2) (West Supp.1993). The relief the Court grants Mrs. Smith on her estoppel theory goes beyond COBRA
 COBRA's notice requirement is not foreign to state case law on termination of health and accident insurance after disability occurs. SeeGuardian Life Ins. Co. v. Zerance, 505 Pa. 345, 479 A.2d 949, 953 (1984) (clear provisions of termination clause in question were part of insurance contract and permitted termination of coverage, upon notice, after the covered disability was incurred, but only upon express notice). Unfortunately for Mrs. Smith, state law does not apply to the Hospital's self-insured plan. See 29 U.S.C.A. Sec. 1144(a) (West 1985) (ERISA preempts all state laws relating to employee benefit plans); Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); see alsoFMC Corp. v. Holliday, 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) (any state laws regulating insurance are preempted by ERISA for self-funded plans).
 
 
 [3]
 Generally, liability under ERISA is imposed on the Plan itself. Here the Court holds that the employer, not the Plan, can be liable. Some cases have allowed an ERISA action based on equitable estoppel against an employer reasoning it would not adversely affect the actuarial soundness of the fund. See, e.g.,Rodrigue, 948 F.2d at 969; P.I.A. Michigan City v. National Porges Radiator, 789 F.Supp. 1421 (N.D.Ill.1992); Stenke v. Quanex Corp., 759 F.Supp. 1244 (E.D.Mich.1991); Bogue v. Ampex Corp., 750 F.Supp. 424 (N.D.Cal.1990), aff'd, 976 F.2d 1319 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993). While the Plan has a fiduciary relation to the beneficiaries, the employer may not. Use of estoppel may blur that distinction. The cases that have imposed ERISA liability on an employer do not discuss the effect this imposition of liability may have on the ability of the employer to continue to finance the benefits it has promised under its self-insured plan
 In Fischer v. Philadelphia Elec. Co., 994 F.2d 130, 133 (3d Cir.1993), however, we held an employer could be liable under ERISA for misrepresenting to employee-participants of its self-insured retirement plan the fact that changes which could affect the timing of their decision to take early retirement were under serious consideration. Here, I think any actions of the Hospital in a fiduciary capacity are immaterial to any fiduciary duty it may have under Sec. 502(a)(3) of ERISA not to make material misrepresentations to its employee-participants, First, I believe Mrs. Smith was no longer an employee-participant in the Plan when the Hospital's misrepresentations were made. Secondly, I do not believe she can demonstrate detrimental reliance. Finally, I note my belief that it is necessary to base any duty to avoid misrepresentation a construction of Sec. 502(a)(3) which does impose on an employer a fiduciary duty to its employees. I believe the court's decision here rests on that construction. Otherwise, direct imposition of liability on an employer based upon common law actions for fraud or deceit could raise preemption issues.
 
 
 [4]
 In Hozier, 908 F.2d at 1165 n. 10, we merely noted the possibility of an estoppel in the presence of extraordinary circumstances. In Gridley v. Cleveland Pneumatic Co., 924 F.2d 1310, 1319 (3d Cir.1991), we set forth the requirements of equitable estoppel but concluded that it was there unnecessary to decide whether estoppel was available as a theory for recovery of benefits secured by ERISA because the common law requirement of detrimental reliance was not met. In Rosen, 637 F.2d at 598, we did permit a participant to estop a pension fund from denying benefits despite a plan provision mandating that certain contributions to the plan be made by the employer where the employee was allowed to make the employer's contributions himself. In Hozier, we recognized that Rosen "can be classified as one of the 'extraordinary circumstances' as outlined in [prior ERISA cases limiting the use of estoppel to extraordinary circumstances]." Hozier, 908 F.2d at 1165 n. 10 (quoting Rosen, 637 F.2d at 598)
 
 
 [5]
 Generally, premiums for individual plans are substantially higher than those for the individual participants in group plans. SeeLocal 217, Hotel & Restaurant Employees' Union v. MHM, Inc., 976 F.2d 805, 809 (2d Cir.1992) (recognizing group rate is lower than individual rate and this is one of reasons COBRA group continuing coverage was enacted). The conversion requirement is not uncommon in group plans for employees. Of course, if the continuing premiums are beyond the independent means of the worker whose disability has cost him his income from employment, the insurer's promise to indemnify will be empty words in that worker's ears
 
 
 [6]
 For some reason the record has not been fully developed on this point. The reader is, however, again reminded that Blue Cross/Blue Shield is not a party to this case
 
 
 [7]
 I agree with the Court that the district court should, if it determines that Mrs. Smith was still in the employ of the Hospital at the time of the changeover in plans or that the Hospital is estopped from denying this fact, reconsider its decision that no conversion privilege was available because the Blue Cross/Blue Shield group plan was canceled in favor of another. The district court, on remand, must resolve which version of the provision, as discussed supra at 140-41, applies and what that provision means