

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-8-2008

# Pell v. EI DuPont de Nemours

Precedential or Non-Precedential: Precedential

Docket No. 06-5006

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Pell v. EI DuPont de Nemours" (2008). *2008 Decisions*. Paper 593.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/593

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 06-5006 and 06-5088

———

MELVYN PELL; ELLEN PELL

Appellants No. 06-5088

v.

E. I. DUPONT DE NEMOURS
& COMPANY INCORPORATED,
Individually and in its capacity as Administrator
of the DuPont Pension and Retirement Plan;
THE BOARD OF BENEFITS AND PENSIONS
OF E. I. DUPONT DE NEMOURS,

Appellants No. 06-5006

———

On Appeal from the United States District Court
for the District of Delaware
(D.C. No.  02-cv-00021)
District Judge:  Honorable Kent A. Jordan

———

Argued April 15, 2008

Before:  AMBRO, FISHER and MICHEL,[*] *Circuit Judges*.

(Filed: August 8, 2008)

Robert Jacobs (Argued)
Jacobs & Crumplar
2 East 7th Street
P.O. Box 1271
Wilmington, DE  19899
        *Attorney for Melvyn Pell and Ellen Pell*

Donna L. Goodman
E.I. DuPont de Nemours & Company
Legal Department
Suite D-7017A
1007 Market Street
Wilmington, DE  19898

---

[*]The Honorable Paul R. Michel, Chief Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

2

Raymond M. Ripple (Argued)
E.I. DuPont de Nemours & Company
Legal Department
Suite D-7012
1007 Market Street
Wilmington, DE 19898
    *Attorneys for E. I. Dupont de Nemours
    & Company Incorporated and the
    Board of Benefits and Pensions of
    E. I. Dupont de Nemours*

---

## OPINION OF THE COURT

---

FISHER, *Circuit Judge*.

Retired employee Melvyn Pell and his wife, Ellen Pell (collectively, "Pell") initiated this litigation against E.I. DuPont de Nemours and Co. and its Board of Benefits and Pensions (collectively, "DuPont") under the Employee Retirement Income Security Act ("ERISA"). Pell claimed that his pension benefit is lower than DuPont had led him to expect. After a bench trial, the District Court enjoined DuPont to use a "credited service date" of August 1, 1972, when calculating Pell's future benefits, resulting in a higher monthly pension benefit. The parties cross appealed.

For the reasons that follow, we will affirm the District Court's ruling that Pell is entitled to relief under ERISA. We

3

will reverse the District Court's ruling that Pell is not entitled to restitution for his past unduly low pension payments. Additionally, we will reverse the District Court's injunction insofar as it requires DuPont to calculate Pell's benefit using the August 1, 1972 service date, because we conclude that DuPont must use a service date of February 10, 1971.

## I. BACKGROUND

On February 10, 1971, Consol, a wholly-owned subsidiary of Conoco, Inc., hired chemical engineer Melvyn Pell to work at its facility in Pittsburgh, Pennsylvania. According to the terms of the Consol Pension Plan, Pell was not eligible to participate in the Consol Plan until the first day of the month following his thirtieth birthday. Pell turned thirty in July 1972, and thus his pension benefit calculation date was August 1, 1972. In 1981, Conoco and Consol merged with DuPont. In 1982, Pell accepted a temporary position with DuPont in Wilmington, Delaware. Under the temporary assignment, Pell remained a Consol employee and continued to receive his salary and benefits from Consol.

In 1983, DuPont, Consol, and Conoco jointly created a policy covering the transfer of employees between the companies. The transfer guidelines were not meant for general distribution, since relatively few employees transferred between the companies. All three companies followed the guidelines when effecting permanent employee transfers. The guidelines explained how pensions would be calculated for transferred employees:

4

"Continuity of Service

DuPont will recognize a transferred Conoco/Consol employee's service to the same extent Conoco/Consol recognized it at the transfer date. . . . This service will be used for benefit eligibility, vesting, and pension computation. . . . Consol service for DuPont pension calculation purposes will be recognized only from 11/1/75 forward.[1] (Although all service recognized by Consol will be used to determine pension and other plan eligibility.)"

The transfer guidelines also contained a provision stating that when DuPont received a transferred employee, Conoco/Consol would furnish a letter to the transferred employee indicating the employee's years of service, adjusted service date, beneficiary designations, creditable service, and eligibility for and participation in benefit plans. A sample of this letter contained in the guidelines stated that the company receiving the transferred employee "will recognize [the employee's] service to the same extent that [the sending company] recognized it at the time of transfer. This service will

---

[1]On November 1, 1975, the Consol pension plan changed so that it no longer had optional contributory features. The DuPont Board of Directors adopted the 1975 cutoff date for pension computations in order to prevent inequities that could have arisen based on whether transferred Consol employees had participated in the contributory feature.

5

be used for eligibility, vesting and benefit computation in the [receiving company's] benefit plans."

In late 1983, Pell's DuPont manager asked Pell to permanently transfer from Consol to DuPont. Pell was concerned that his salary would decrease upon transferring to DuPont but believed that DuPont's more generous pension plan would offset the lower salary. Pell's principal concern about his prospective DuPont pension was whether he would be credited for his time employed with Consol. Pell's DuPont manager and supervisor both assured him that his Consol service time would be counted under the DuPont pension plan.

While Pell was considering whether to permanently transfer to DuPont, he received a letter from William Waddell, the Director of Employee Compensation and Benefits at Consol (the "Waddell letter"). That letter, dated January 13, 1984, closely followed the transfer guidelines. It listed Pell's "Retirement Plan Credited Service Date" as August 1, 1972, which was the same date that Consol recognized as the start date under the Consol Plan. Waddell's letter further stated:

> "Retirement Plan: Your transfer will not be considered a termination of employment for retirement purposes. Both creditable service and earnings used in calculating your benefit under Consol's Retirement Plan will be 'frozen' effective with your date of transfer to DuPont. Service with DuPont will be deemed membership service within the terms of the Consol Plan and counts only for vesting purposes. Compensation

6

earned during your employment with DuPont will be used in determining your final average compensation for benefit purposes under the DuPont Plan. The Pension you receive will be calculated under the DuPont Plan based on your total combined service. This retirement benefit will be offset by any payment you receive from the Consol Plan as a result of your accrued benefit as of the date of transfer."

After receiving these oral and written assurances about his pension benefit, Pell accepted the permanent transfer to DuPont with a retroactive transfer date of January 1, 1984.

In 1991, Pell received a document from DuPont indicating that his adjusted service date was 1975. Pell was concerned and contacted Doris Uhde, a pre-retirement counselor for DuPont, who assured him via email that his adjusted service date was "2/10/71, not 1975 and DuPont [would] use this date for [Pell's] years of service under their formula when calculating [his] pension."[2]

In 1992, Pell requested from DuPont two estimates of his pension benefits, and each of these estimates listed February 10,

_____

[2]Although Consol employees did not become eligible to participate in the Consol Plan until after their thirtieth birthdays, DuPont employees were eligible to participate in the DuPont plan beginning on their first day of employment. February 10, 1971, was Pell's first day of employment with Consol.

7

1971, as his adjusted service date. In 1998, Pell requested another pension estimate, and this estimate also stated that his adjusted service date was February 10, 1971. In 1999, Pell received a benefit resources statement from DuPont indicating that he had 28.5 years of service as of August 31, 1999, which was consistent with an adjusted service date of February 10, 1971. Each estimate contained text at the bottom of the page indicating that it was an estimate subject to review and individual adjustments.

In August 2000, Pell inquired what his pension benefits would be if he retired on December 31, 2000. On December 14, 2000, DuPont informed Pell that it was changing his adjusted service date to August 1, 1972, thus reducing his recognized service by 1.475 years. Pell requested a reconsideration of his adjusted service date, and DuPont's Benefit Administration department provided him with a final pension estimate via email on December 19, 2000.

According to the final estimate, Pell would receive (1) a pension benefit for his Consol employment that would be "exactly the same . . . as if Consol had calculated and paid it," and (2) a pension benefit for his DuPont employment based on his service from November 1, 1975 until retirement, partially offset by the payments under the Consol Plan. The email to Pell from the Benefit Administration department also noted:

> "All of your previous documentation does use
> Adjusted Service Date (ASD) equal to 2/10/71.
> However, ASD is not a pension date - it is used
> for many business specific uses (such as vacation

8

entitlement, service awards, etc.). The ASD is also used to determine vesting and eligibility service under the plans, but may need to be adjusted to reflect pension benefit accrual service, and in your case it is . . . . [T]he estimate provided to you about eight years ago . . . . was in error."

Upon receiving his final pension estimate, Pell responded that he "may not be able to retire as scheduled."

Pell appealed his pension estimate to the DuPont Board of Benefits and Pensions, which upheld the determination. He retired on May 31, 2001.

In 2002, Pell filed a complaint against DuPont in the District Court for the District of Delaware. He requested an injunction ordering DuPont to pay the higher pension amount. After a bench trial, the District Court ruled that Pell was entitled to relief under ERISA based on the theory of equitable estoppel. The Court further determined that under § 502(a)(3) of ERISA (codified at 29 U.S.C. § 1132(a)(3)), Pell was not entitled to restitution for the past pension payments that had been too low. The Court issued an injunction requiring DuPont to use August 1, 1972 as the service date for calculating Pell's future pension benefits. DuPont filed a timely Notice of Appeal and Pell filed a timely Notice of Cross Appeal.

## II. DISCUSSION

The District Court had jurisdiction under 28 U.S.C. § 1331 and ERISA, 29 U.S.C. § 1001 *et seq.* We have jurisdiction under 28 U.S.C. § 1291.

### A. Standing[3]

ERISA provides that "[a] civil action may be brought . . . by a participant or beneficiary . . . ." 29 U.S.C. § 1132(a)(3). A "participant" is "any employee or former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). DuPont argues that the actions or omissions forming the basis of Pell's claim took place in 1983 and 1984 before he was employed by DuPont. Because Pell was neither a "participant" in nor a "beneficiary" of DuPont's plan at that time, DuPont asserts that he does not have standing under ERISA's civil enforcement provision.

DuPont's argument does not take into account Pell's retroactive DuPont employment date. The Waddell letter, dated January 13, 1984, misled Pell about the amount of his pension

---

[3]This issue was not raised in the District Court. However, "[l]ike any jurisdictional requirement, standing cannot be waived." *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 n.5 (3d Cir. 1997). "We have plenary review over questions of standing." *Miller v. Rite Aid Corp.*, 334 F.3d 335, 340 (3d Cir. 2003).

benefits. Pell accepted employment with DuPont after January 13, 1984, with a retroactive effective date of January 1, 1984. Using Pell's retroactive employment start date, he received the Waddell letter during his time as an "employee" of DuPont who "may become eligible to receive a benefit." 29 U.SC. § 1002(7). Therefore, he has standing to sue under ERISA.

In addition, the District Court determined that Pell "reasonably and detrimentally relied on the informational statements estimating his pension benefits and showing February 10, 1971 as his service date." These estimates indisputably occurred while Pell was a DuPont employee in 1992, 1998, and 1999. Therefore, the estimates – in addition to the Waddell letter – confer standing upon Pell.

B. Equitable Estoppel under ERISA

The District Court correctly concluded that Pell is entitled to relief under ERISA based on an equitable estoppel theory. "On appeal from a judgment entered after a non-jury trial, we review findings of fact for clear error and conclusions of law de novo." *Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 572 (3d Cir. 2006) (internal citations omitted).

A beneficiary may "obtain . . . appropriate equitable relief . . . to redress [ERISA] violations or . . . to enforce any provisions of [ERISA]." 29 U.S.C. § 1132(a)(3). A beneficiary can make out a claim for "appropriate equitable relief," *id.*, based on a theory of equitable estoppel. *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir. 1994). "To succeed under this theory of relief, an ERISA plaintiff must

11

establish (1) a material representation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Id.*

### 1. Material Misrepresentation

"[A]ny provision of a plan subject to ERISA that establishes a benefit is a material term of the plan." *Id.* at 237. "[A] misrepresentation is material if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Fischer v. Phila. Elec. Co.*, 994 F.2d 130, 135 (3d Cir. 1993).

The District Court correctly determined that, under our case law, DuPont's representations about Pell's pension benefit calculation date were material. *Pell v. E.I. DuPont de Nemours & Co.*, No. 02-00021, 2006 WL 2864604, at *6-7 (D. Del. 2006). When evaluating whether he can afford to retire, a reasonable employee would consider the amount of his pension, which in Pell's case depended on his pension benefit calculation date.

Previously, we have concluded that representations were material where they led an employee to wrongly believe that accidental death and dismemberment insurance was available. *Curcio*, 33 F.3d at 236-37. We have also determined that representations could be material where an employer stated that no early retirement incentives were on the horizon, when in fact management was considering such a program. *Fischer*, 994 F.2d at 134-35. As in *Curcio* and *Fischer*, DuPont's

12

representations to Pell about his pension benefit calculation date misled Pell as he attempted to make an adequately informed decision about his benefits.

DuPont argues that its misrepresentations about Pell's pension calculations were not material because Pell discovered the errors before making his final retirement decisions. This argument is unpersuasive. The test for materiality does not depend on when an employee discovers the misrepresentations. The test is whether the information "would mislead a reasonable employee in making an adequately informed decision" about retirement. *Id.* In this case, it is clear that the information – misreporting about the amount of a pension benefit – would mislead a reasonable employee. The misleading nature of the information was demonstrated by the fact that Pell changed his retirement plans, retiring on May 31, 2001, rather than December 31, 2000. That Pell discovered the error while he still had time to alter his plans does not change the fact that DuPont's statements were material.

## 2. Reasonable and Detrimental Reliance

As the phrase "reasonable and detrimental reliance" implies, in order to prevail, Pell must show (1) reasonableness and (2) injury. *Curcio*, 33 F.3d at 237. The District Court correctly concluded that Pell reasonably and detrimentally relied on the Waddell letter and the pension estimates he received throughout the 1990s.

a) Reasonable Reliance

We have determined that when an individual acts with apparent authority to determine an employee's status in relationship to a benefit plan, the plan fiduciary can be responsible for the individual's material misstatements. *Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 989 (3d Cir. 1995). In *Taylor*, a former employee claimed that the Supervisor of Employee Benefits led him to believe that an early retirement incentive plan would apply to him retroactively. *Id.* at 985. When deciding whether the employee had reasonably relied on the Supervisor's statements, we invoked the doctrine of apparent authority, which "(1) results from a manifestation by a person that another is his agent and (2) exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." *Id.* at 989 (internal quotation marks and citation omitted).

The Supervisor in *Taylor* had apparent authority because (1) he had actual authority to perform ministerial functions such as advising employees of their rights and preparing reports, and (2) "the plan participants . . . reasonably believed that [the Supervisor] specifically had the authority to counsel plan participants about possible amendments to the plan." *Id.* Therefore, under ERISA, the plan fiduciary was responsible for the Supervisor's material misstatements. *Id.*

DuPont argues that Pell's reliance on the letter from William Waddell, Consol's Director of Employee Compensation and Benefits, was unreasonable because Waddell "had no authority to speak for DuPont." The District Court correctly

14

determined, however, that as in *Taylor*, Waddell acted with "apparent authority." The transfer guidelines were a manifestation by DuPont that Waddell was its agent. The guidelines stated that when an employee transferred from Consol to DuPont, Consol would provide a letter to the employee and to DuPont describing in detail the employee's status with regard to both Consol and DuPont benefit plans. Waddell, therefore, acted as DuPont's agent when he wrote the letter to Pell.

It was reasonable for Pell to believe that Waddell was authorized to speak on DuPont's behalf. As the District Court stated:

"Mr. Pell received the Letter from Mr. Waddell, the Director of Employee Compensation and Benefits of his employer Consol, which was owned and controlled by DuPont . . . . Mr. Waddell . . . was an appropriate person to promulgate that information . . . . The Letter indicated on its face that it had been copied to DuPont management, including the division head of Personnel and Employee Relation[s], and Mr. Herron [a supervisor in the Employee Compensation Benefits Division] testified that he believed that he received the Letter in the ordinary course of his position. It was reasonable for Mr. Pell to understand that Mr. Waddell was communicating on behalf of all the subparts of DuPont's corporate structure the information that

15

> DuPont intended for him to act upon in deciding whether to accept a transfer."

*Pell*, 2006 WL 2864604 at *9 (internal quotation marks and citation omitted). In sum, the District Court correctly concluded, based on the elements of the *Taylor* apparent authority test, that Pell reasonably relied on the Waddell letter. *Taylor*, 49 F.3d at 989.

The District Court found that it was also reasonable for Pell to rely on the pension estimates he received during the 1990s. *Pell*, 2006 WL 2864604 at *9. DuPont asserts that because each estimate contained a disclaimer clearly labeling the calculation as an "estimate" that was subject to "review and correction,"[4] Pell could not have reasonably relied on the estimates. DuPont's argument fails because it does not take into account Pell's 1991 email exchange with Doris Uhde, a DuPont pre-retirement counselor. In that exchange, Pell inquired what

---

[4]Specifically, the disclaimers included language such as: "The calculation is a broad estimate . . . . It does not account for prior plans, prior distributions, or other individual adjustments"; "This is an ESTIMATE and is not the final calculation of your pension benefit . . . . The historical data used in this estimate (pension base earnings, FICA earnings, and adjusted service date) are subject to review and confirmation at time of formal application for pension"; "THIS IS AN ESTIMATE. Data used in this estimate are subject to review and correction in determining your benefit at retirement."

16

date would be used for his pension calculation, and Uhde replied:

> "Consol pension will be calculated on their formula and their SS offset. Your adjusted service date is 2/10/71 not 1975 and Du Pont will use this date for your years of service under their formula when calculating your pension. The 'Pension' booklet in your green Benefits Binder explains the Du Pont formulas; however, nothing written re offsets as each would be different."

After this exchange, Pell's subsequent pension estimates (in 1992, 1998, and 1999) listed 1971 as the date from which his benefit would be calculated.

For the same reasons that it was reasonable for Pell to rely on the Waddell letter, it was reasonable for him to rely on Uhde's apparent authority to act on DuPont's behalf. By giving Uhde responsibility for assisting DuPont employees with their retirement planning, DuPont manifested that she was its agent. *See Taylor*, 49 F.3d at 989. It was reasonable for Pell to believe that Uhde had the authority to determine his adjusted service date. *Id.* Moreover, it was reasonable for Pell to believe, going forward, that his conversation with Uhde had set the record straight. Having clarified his adjusted service date (or so he thought), Pell reasonably believed that his employment records had been corrected and that his pension benefit would be calculated based on the 1971 date.

17

If we were to accept DuPont's argument that Pell could not rely on his pension estimates, employees such as Pell would be required to continually question their benefits calculations, even if they agreed with their employers' estimates. We decline to formulate such a burdensome rule. In the context of Pell's exchange with Uhde and his subsequent pension estimates that reflected a 1971 adjusted service date, it was reasonable for him to rely on the estimates, despite their disclaimer language.

b) Detrimental Reliance

In order to show detriment, or injury, a plaintiff must demonstrate that he relied upon the employer's representations in a way that later led to injury. *Curcio*, 33 F.3d at 237. Pell detrimentally relied on the Waddell letter when he decided to transfer permanently from Consol to DuPont. He did not finalize the transfer until after he had received the letter's confirmation of his pension benefit calculation date. Pell was injured because he accepted a lower salary and he permanently moved his family to Delaware, despite concerns about the cost of living and the quality of his children's schools.

DuPont argues that Pell did not detrimentally rely on the pension estimates, because he did not take any actions based on the information they contained. However, our case law recognizes that refraining from taking action can constitute detrimental reliance.

In *Curcio*, we said that the plaintiffs' detrimental reliance was "giving up an opportunity to accommodate their insurance needs through an independent insurance carrier." 33 F.3d at

18

237. In *Smith v. Hartfod Insurance Group*, 6 F.3d 131, 137 (3d Cir. 1993), we concluded that there was detrimental reliance, even though the reliance could be expressed as a failure to act (not converting to an individual health care policy that would have provided adequate coverage) or an action (signing up for a new group health care plan that provided inadequate coverage). DuPont's argument does not convince us to draw a new distinction between active and inactive detrimental reliance.

Pell relied to his detriment on the pension estimates he received in the 1990s by refraining from taking certain actions. Pell testified that if he had known how his pension would be calculated, he would have explored whether he could return to Consol, get another job with a better pension, or retire sooner and start a consulting business. He was injured because he did not take any of these actions that might have benefitted him.[5]

Pell has shown that the second element of equitable estoppel – reasonable and detrimental reliance – is present in this case. As the District Court concluded, Pell demonstrated that his reliance on the Waddell letter and the 1990s pension

---

[5]It is reasonable to believe that Pell, an engineer with a Ph.D., an MBA, and an employment history with Consol and DuPont, could have found alternative employment or could have opened his own consulting business. *Cf. Smith v. Hartford Ins. Group*, 6 F.3d 131, 137 (3d Cir. 1993) (rejecting theories of detrimental reliance because the plaintiffs produced no evidence that the actions they would have taken were realistically possible).

estimates was reasonable and caused him injury. *See Curcio*, 33 F.3d at 237.

### 3. Extraordinary Circumstances

The District Court determined that Pell met the third element of the equitable estoppel theory, concluding that the circumstances of his case are extraordinary and thus warrant relief under 29 U.S.C. § 1132. DuPont claims that the District Court erred, because a finding of extraordinary circumstances usually results from the employer's acts of bad faith and not from mere reporting errors.

In the past, we have determined that extraordinary circumstances existed in a variety of factual scenarios. *Kurz v. Phila. Elec. Co.* (*Kurz II*), 96 F.3d 1544, 1553 (3d Cir. 1996) (collecting cases). Extraordinary circumstances can arise where there are "affirmative acts of fraud," where there is a "network of misrepresentations . . . over an extended course of dealing," or where particular plaintiffs are especially vulnerable. *Id.*

In this case, the District Court ruled in Pell's favor because of DuPont's "repeated misrepresentations over an extended course of dealings." *Pell*, 2006 WL 2864604 at *10 (citing *Kurz II*, 96 F.3d at 1553; *Smith*, 6 F.3d 131). As the District Court explained:

> "[R]epeated misrepresentations over an extended course of dealings between an employer and an employee are sufficient to demonstrate the existence of extraordinary circumstances, when,

20

as here, it is clear that the employee has been diligent in inquiring into the employer's representations, in seeking clarifications about those representations, and in obtaining reaffirmations of those representations."

*Pell*, 2006 WL 2864604 at *10. We agree with the District Court that there were extraordinary circumstances.

In the *Kurz* cases, Kurz and other employees claimed that their employer had made material misrepresentations about the terms of an early retirement plan. *Kurz v. Phila. Elec. Co.* (*Kurz I*), 994 F.2d 136, 139 (3d Cir. 1993). The employees had attended individual retirement interviews in which some of them asked whether changes to the retirement plan were forthcoming. *Id.* The employer's retirement counselors answered in the negative, but in fact, management was actively considering an early retirement incentive plan. *Id.* at 137-38. The plan was instituted shortly after the employees retired and did not apply to them retroactively. *Id.* at 138. We concluded that despite the inaccurate information given by the retirement counselors, there were no extraordinary circumstances. *Kurz II*, 96 F.3d at 1553-54. We explained: "There is no conduct suggesting that [the employer] sought to profit at the expense of its employees, no showing of repeated misrepresentations over time, [and] no suggestion that plaintiffs are particularly vulnerable." *Id.* at 1553.

DuPont argues that Pell's case is like *Kurz*, and "simple ERISA reporting errors or disclosure violations," *id.*, do not constitute extraordinary circumstances. Contrary to DuPont's

21

argument, *Kurz* is distinguishable from this case. DuPont did not commit a simple ERISA reporting error. Instead, it made affirmative misrepresentations to Pell over an extended period of time. This case is therefore not like *Kurz*, where the misrepresentation to each employee took place in a single conversation. *Id.*

Pell's case, as the District Court concluded, is more like *Smith*. 6 F.3d 131. In *Smith*, the employee's husband sought information regarding the employer's new health insurance plan and received multiple inaccurate assurances that the coverage his wife needed would be available. *Id.* at 134-35. We concluded that on remand, "a factfinder could find . . . [that extraordinary] circumstances are established, in light of the [employer's] repeated oral and written misrepresentations to [the husband], his diligence in attempting to obtain accurate answers regarding his wife's coverage, as evidenced by his persistent questioning of [human resources and insurance company] personnel, and the immense coverage expenses at stake." *Id.* at 142.

Like the *Smith* plaintiffs, Pell was "diligent" and engaged in "persistent questioning" about the significant benefits at stake. Relying on *Smith*, the District Court correctly determined that DuPont's repeated affirmative misrepresentations, combined with Pell's diligence, demonstrate that there are extraordinary circumstances.[6]

---

[6]DuPont argues that the special vulnerability of the *Smith* plaintiff, who had suffered a cerebral hemorrhage and needed

22

In sum, we agree with the District Court that Pell has established the elements of an equitable estoppel claim under ERISA. DuPont made material misrepresentations about the amount of Pell's pension benefit, Pell reasonably and detrimentally relied on those misrepresentations, and DuPont's inaccuracies over an extended course of dealing constitute extraordinary circumstances warranting relief.

## C. Remedies

Having determined that Pell is entitled to relief under ERISA based on an equitable estoppel theory, we turn to the parties' disputes over remedies. DuPont argues that the District Court's injunction was an impermissible form of relief under ERISA. In addition, DuPont asserts that the relief Pell was granted goes beyond the terms of the pension plan and thus constitutes an impermissible "informal amendment" to the plan.

Pell, for his part, argues that the District Court should have awarded him restitution for his past unduly low pension benefit payments. He also claims that the District Court erred

---

skilled inpatient nursing care, was crucial to the finding of extraordinary circumstances. 6 F.3d at 133. Our subsequent case law shows that the vulnerability of the plaintiff is just one factor and is not necessary to demonstrate extraordinary circumstances. *See, e.g.*, *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 152 (3d Cir. 1999).

when it determined that DuPont should calculate his benefits based on the 1972 adjusted service date rather than 1971.

Determining what remedies are available under a statute is a question of statutory interpretation that requires de novo review. *Daniel S. v. Scranton Sch. Dist.*, 230 F.3d 90, 97 (3d Cir. 2000). Therefore, we review de novo the District Court's grant of an injunction and its denial of restitution for past low benefit payments. *Id.* The District Court's determination that 1972 is the appropriate adjusted service date is a mixed conclusion of law and fact. *See Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 269-70 (3d Cir. 2005). We break down such conclusions into their components and apply the appropriate standard of review to each component. *Universal Minerals, Inc. v. C. A. Hughes & Co.*, 669 F.2d 98, 103 (3d Cir. 1981). "We must accept the trial court's findings of historical or narrative facts unless they are clearly erroneous, but we must exercise a plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts." *Id.*

The District Court correctly concluded that an injunction was an appropriate remedy, but it erred when it refused to award Pell restitution for his past unduly low pension benefits. In addition, the Court erred when it determined that 1972, not 1971, was the appropriate adjusted service date.

1. Injunctive Relief Under ERISA

DuPont argues that the injunction requires it to pay Pell more money than it would have otherwise. DuPont claims that

24

the injunction is therefore a legal rather than an equitable remedy, and that such relief is not available under ERISA.

In light of ERISA's detailed enforcement scheme, courts are "especially reluctant to . . . [create] remedies not specifically authorized by its text." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002) (internal quotation marks and citation omitted). ERISA provides for the issuance of injunctions in order to grant "appropriate equitable relief" to aggrieved employees such as Pell. *Id.* (quoting 29 U.S.C. § 1132(a)(3)). The Supreme Court has reasoned that "[e]quitable relief must mean *something* less than *all* relief," and therefore it has explained that § 1132(a)(3) authorizes only "those categories of relief that were *typically* available in equity." *Id.* at 210 (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 258 n.8 (1993)). Thus, the main question in assessing injunctions such as the one before us is whether the injunction constitutes a permissible equitable remedy or an impermissible legal one. *See Eichorn v. AT&T Corp.*, 484 F.3d 644, 654-55 (3d Cir. 2007).

*Great-West* could be read as providing facial support for DuPont's argument that Pell's injunction actually constitutes a legal, rather than an equitable, remedy. But the injunction effectively creates a constructive trust on particular property in DuPont's possession, rather than imposing personal liability on DuPont. Therefore, as subsequent Supreme Court case law confirms, the injunction falls within the type of equitable relief that ERISA authorizes.

25

In *Great-West*, Mrs. Knudson was rendered quadriplegic in an auto accident, and her husband's employer-provided health plan paid her medical expenses. 534 U.S. at 207. A reimbursement provision gave the plan the right to recover its benefit payments from Mrs. Knudson if she recovered them from a third party. *Id.* After the Knudsons received a $650,000 settlement from the auto manufacturer, Great-West initiated legal action under ERISA to enforce the reimbursement provision. *Id.* at 207-08. The Supreme Court examined whether the remedy Great-West sought would have been available from a court of equity "[i]n the days of the divided bench." *Id.* at 212. The Court noted that equitable restitution was historically available "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.* at 213.

The Court denied relief to Great-West because the Knudsons' settlement proceeds were not in their possession, but had been distributed to attorneys, a Special Needs Trust, and other parties. *Id.* at 214. Therefore, "[t]he kind of restitution [Great-West sought was] . . . not equitable – the imposition of a constructive trust or equitable lien on particular property – but legal – the imposition of personal liability for the benefits that [Great-West] conferred upon [the Knudsons]." *Id.*

*Sereboff v. Mid Atlantic Medical Services*, 547 U.S. 356 (2006), followed and amplified upon *Great-West*. *Sereboff*'s basic facts are identical to *Great-West*. ERISA plan beneficiaries (the Sereboffs) were injured in an auto accident and received a settlement from a third party. *Id.* at 359-60. The

26

health plan (Mid Atlantic) took legal action to claim part of the settlement proceeds pursuant to a reimbursement provision. *Id.* at 360. The facts differed from *Great-West* in that the parties entered into a "stipulation . . . under which the Sereboffs agreed to preserve $74,869.37 of the settlement funds in an investment account, until the [District] Court rule[d] on the merits of [the] case and all appeals . . . [were] exhausted." *Id.* at 360 (internal quotation marks and citation omitted). The Supreme Court decided that the "impediment to characterizing the relief in [*Great-West*] as equitable [was] not present." *Id.* at 362. Because the funds in question had been set aside and were specifically identifiable in the Sereboffs' investment accounts, Mid Atlantic could recover through the traditional equitable remedies of constructive trust or equitable lien. *Id.* at 362-63.

*Sereboff* shows that a remedy cannot be classified as legal merely because it consists of payments. *Id.* A remedy involving payments is permissible so long as those payments would have historically been available in courts of equity. *Id.* In fact, prior to *Sereboff*, we had already determined that ERISA relief may include payments of money if those payments are properly characterized as an equitable remedy. *Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 211-12 (3d Cir. 2004). In *Skretvedt*, we noted:

> "[Some have] perceived in *Great-West* a per se pronouncement that where a plaintiff seeks an award that ultimately involves money . . . , such an award is a claim for legal relief and is not available under § [1132](a)(3)(B). . . . Our reading, however, is that *Great-West* did not

adopt such a rule. Instead, the Supreme Court indicated that, to determine whether a specific form of underlying relief requested is available under § [1132](a)(3)(B), we must consider whether [the] relief was typically available at law or in equity and, in the case of restitutionary relief, whether the relief requested was in fact a form of equitable restitution."

*Id.*

In this case, the relief is an injunction to calculate Pell's future pension payments using an earlier adjusted service date. Injunctions are legal remedies if they "compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, [a remedy that] was not typically available in equity." *Great-West*, 534 U.S. at 210-11. The injunction imposed by the District Court in this case is forward-looking and entitles Pell to an amount of money that cannot be calculated with specificity (since it is unknown how long he will survive and be entitled to benefits). Therefore, the injunction is an equitable remedy that is permissible under ERISA.

In addition to attacking the form of the remedy that Pell received, DuPont argues that ERISA provides a cause of action only to recover the benefits that are due under the terms of an employee benefit plan. DuPont states that because Pell is already receiving the pension payment to which he is entitled under the terms of the plan, he is without relief under ERISA. Relying on *Great-West*, 534 U.S. 204, and *Sereboff*, 547 U.S. 356, DuPont claims that an employee such as Pell cannot

28

receive relief beyond that specified by the plan terms. DuPont argues that the District Court's injunction renders DuPont's erroneous representations to Pell an impermissible "informal amendment" to the plan. *Confer v. Custom Eng'g Co.*, 952 F.2d 41, 43 (3d Cir. 1991).

We have previously considered and rejected this argument. *See In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 57 F.3d 1255, 1264-65 (3d Cir.1995). Although *Unisys* dealt with a breach of fiduciary duty claim, our rationale for providing relief beyond a plan's terms encompassed equitable estoppel as well:

> "Imposing upon an employer a fiduciary duty in this case does not threaten or contradict our well-established policy disfavoring informal plan amendments . . . . [O]ur equitable theories of relief under ERISA (breach of fiduciary duty and estoppel) are not to be construed as conflicting with our precedent precluding oral or informal amendments to ERISA benefit plans.

> The retirees here do not argue that Unisys' misrepresentations modified their retiree medical benefit plans. Rather, for purposes of their breach of fiduciary [duty] claim, they *assume* the plans did not contractually vest benefits, and claim instead that the company breached its fiduciary duty by leading employees to believe that the plans did. This claim is distinct from a claim for benefits under the terms of the plan because it

29

requires different proof . . . than would be required for a contract claim that the plans had been modified.

In recognizing the retirees' breach of fiduciary [duty] claim here, we do not intend to create a precedent for any beneficiary to make claims beyond those provided in a plan."

*Id.* (internal quotation marks and citations omitted).

As in *Unisys*, the District Court in this case "assumed" or acknowledged that the plan terms did not entitle Pell to the higher pension amount. *Pell*, 2006 WL 2864604 at *14. The Court explained: "As [Pell has] met the elements of [his] equitable estoppel claim, it is appropriate to estop DuPont from asserting its right to rely on the terms of the DuPont Plan as a basis for asserting that . . . Pell's adjusted service date is November 1, 1975." *Id.* Thus, the District Court's injunction neither rewrote nor informally amended the plan. The injunction left the plan intact while acknowledging that equity requires DuPont to pay Pell a higher pension amount.

Our case law clearly establishes the right of a plaintiff such as Pell to receive relief beyond the benefits specified in the plan, and the District Court injunction did not rewrite or informally amend the plan. DuPont's argument fails.[7]

---

[7]Subsequent to *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002), we have confirmed the

30

## 2. Restitution for Past Low Pension Benefit Payments

Having determined that it was permissible for the District Court to order DuPont to pay a higher pension benefit going forward, we must examine whether the Court correctly declined to order DuPont to pay restitution for the unduly low payments Pell had already received. Because the pension funds are held in trust by DuPont and thus are specifically identifiable property,

---

viability of the equitable estoppel theory to obtain relief for misrepresentations about the availability of benefits. *See Hooven v. Exxon Mobil Corp.*, 465 F.3d 566, 578 (3d Cir. 2006). *Eichorn v. AT&T Corp.*, 484 F.3d 644 (3d Cir. 2007), is not to the contrary. In that case, AT&T sold a subsidiary, with the result that the subsidiary's employees were no longer AT&T employees. *Id.* at 646-47. These employees later alleged that they were wrongfully prevented from returning to AT&T and regaining their entitlement to AT&T pension benefits because of a "no-hire" agreement. *Id.* at 647. The employees sought to be awarded the benefits they would have received had they remained AT&T employees. *Id.* We concluded that because the plaintiffs were not seeking to enforce the terms of the plan, relief was not available under 29 U.S.C. § 1132(a)(1)(B). *Id.* at 651-53. Unlike Pell, the *Eichorn* plaintiffs' requested relief was based on a hypothetical situation (the possibility that but for the no-hire agreement, they could have returned to AT&T) and was a claim for benefits that they had not earned. *Id.* Here, Pell was a DuPont employee and had earned pension benefits. The logic of *Eichorn* does not affect our conclusion that in this case the relief Pell requests is available under ERISA.

31

the District Court erred when it determined that restitution was not available.

"[A] plaintiff [may] seek restitution *in equity*, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff [can] clearly be traced to particular funds or property in the defendant's possession." *Great-West*, 534 U.S. at 213. The difference between the pension payments Pell actually received and the payments he should have received belongs, "in good conscience," to him. Therefore, Pell can receive restitutionary payments for the difference if the funds can "clearly be traced to particular funds" in DuPont's possession. *Id.*

ERISA says: "Except as provided . . . , all assets of an employee benefit plan shall be held in trust by one or more trustees." 29 U.S.C. § 1103(a). Therefore, ERISA plan funds are, as a matter of law, "held in trust" and are not available to the employer for general use. Our case law, both before and after *Great-West*, treats employee benefit plan funds as trust funds. We have noted that ERISA "requir[es] the application of traditional trust law in the administration of the statute." *Coar v. Kazimir*, 990 F.2d 1413, 1422 (3d Cir. 1993) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989)).

We applied trust law principles in *Skretvedt*, a case where a DuPont employee had previously litigated, and won, the right to disability benefits. 372 F.3d at 198. Skretvedt moved for an award of interest on the wrongfully withheld benefits. *Id.* at 199. We concluded that Skretvedt could be entitled to interest

32

under a restitutionary theory and remanded for further proceedings.[8]  *Id.* at 215.  We determined that such an award would not make DuPont "'personally liable' for 'interest' . . . in violation of *Great-West* [, because] . . . . Skretvedt's cause of action under § [1132](a)(3)(B) is against the relevant ERISA plans whereby he seeks restitution by way of a constructive trust over the actual funds wrongfully earned by those plans."  *Id.* at 214.

We also determined that the funds in question could be "clearly traced":

> "[T]o find the funds Skretvedt alleges belong to him . . . , we need look no further than the ERISA plans that withheld Skretvedt's benefits for several years and profited with respect to the withholding of those benefits. . . .  Skretvedt has

---

[8]Although Pell requested an award of interest on the amount of pension benefits wrongfully withheld, he did not mention this request until he filed his reply brief.  The argument is thus waived.  *Skretvedt v. E.I. DuPont de Nemours*, 372 F.3d 193, 202-03 (3d Cir. 2004) ("[A]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court.").  We do not cite *Skretvedt* here for the proposition that an ERISA litigant can receive interest (although he may), but rather for the proposition that "restitution by way of a constructive trust" is an appropriate and available remedy.  *Id.* at 214.

33

> sufficiently identified specific funds traceable to the defendant ERISA plans that belong in good conscience to him."

*Id.* We added in a footnote: "[A]s several circuit courts have noted, the Senate Finance Committee, in its report on ERISA, specifically contemplated that 'appropriate equitable relief' under § [1132](a)(3)(B) would include, '[f]or example, . . . a constructive trust [to] be imposed on the plan assets . . . .'" *Id.* at 214 n.28 (citations omitted).

The ruling in *Skretvedt* did not violate *Great-West*, nor would a ruling that Pell is entitled to restitution for his unduly low prior pension payments.[9] During Pell's employment, DuPont made contributions to its pension fund to cover the aggregate future pensions of its current employees. The amounts of these contributions were calculated through a formula that specifically took Pell into account. Therefore, the restitution Pell seeks for his unduly low past pension payments is clearly traceable to the plan trust funds in DuPont's possession.

The District Court made an error of law when it assumed that it could not order DuPont to pay Pell for the difference

---

[9]In some cases, *Great-West* will foreclose the plaintiff's remedies because the plan funds will not be clearly traceable. 534 U.S. at 213. This is because ERISA provides exceptions to the requirement that plan funds be held in trust. 29 U.S.C. § 1103(b).

34

between the benefit amounts he received and the amounts he should have received.[10]  Under *Skretvedt*, it is appropriate to impose a constructive trust on the DuPont plan funds to obtain restitution for the portions of the past pension payments that were wrongfully withheld from Pell.  372 F.3d at 214.

### 3.  Adjusted Service Date

The District Court enjoined DuPont to calculate Pell's pension benefits using the date of August 1, 1972.  There are two potential dates that could be used: Pell's first day of employment at Consol (February 10, 1971) or the date on which he became eligible to participate in Consol's pension plan (August 1, 1972).  Pell argues that the District Court erred when it determined that the correct date is August 1, 1972.  We agree.  The 1991 email from DuPont pre-retirement counselor Doris Uhde, combined with the pension benefit estimates Pell received during the 1990s, constitute a material misrepresentation about Pell's adjusted service date.

---

[10]Again, we note that this case is distinguishable from *Eichorn*.  The *Eichorn* plaintiffs sought to be awarded the benefits they would have received had they remained AT&T employees.  484 F.3d at 648.  The relief they requested was in the nature of "back pay" and was legal rather than equitable, so it was unavailable under ERISA.  *Id.* at 656.  Pell's requested relief is not "back pay," but consists of the benefits that DuPont told him he had earned.

35

The District Court chose August 1, 1972 on the basis of the Waddell Letter. Directly below the salutation "Dear Mr. Pell," the letter provided the following information:

"RE: <u>SALARY BENEFIT PLANS</u>

Social Security Number:     [omitted]
Date of Birth:              07-11-42
Employment Date:            02-10-71
Retirement Plan
   Credited Service Date:   08-01-72"

In the second paragraph, under the heading "<u>Retirement Plan</u>," the letter stated: "The Pension you receive will be calculated under the DuPont Plan based on your total combined service. This retirement benefit will be offset by any payment you receive from the Consol Plan as a result of your accrued benefit as of the date of transfer."

The District Court concluded that Pell should have known that the correct date was his eligibility date for participation in the Consol plan, and not his initial Consol employment date. *Pell*, 2006 WL 2864604 at *14 n.13. This conclusion does not take into account DuPont's misrepresentations over an "extended course of dealing." *Kurz II*, 96 F.3d at 1553.

Neither the Waddell letter nor the emails from DuPont's benefits administrators explained unambiguously how Pell's pension would be calculated. But DuPont communicated repeatedly to Pell, in the Uhde email and the 1990s pension

36

estimates, that his adjusted service date was February 10, 1971. In the analysis above, we explained that Pell has made out a claim for equitable estoppel because the Uhde email and the subsequent pension estimates were material misrepresentations, Pell reasonably and detrimentally relied on the misrepresentations, and there were extraordinary circumstances. For these same reasons, DuPont is liable to Pell for benefit payments that reflect a pension calculation date of February 10, 1971.

## III.  CONCLUSION

Pell has standing to sue under ERISA, and the District Court correctly determined that he made out a claim for relief based on the theory of equitable estoppel.  The Court properly enjoined DuPont to pay Pell an increased pension benefit going forward.  However, the Court made an error of law when it determined that Pell could not receive equitable restitution for the amount of his past pension payments that was wrongfully withheld.  In addition, the Court erred when it determined that DuPont should use an adjusted service date of 1972.  Because of DuPont's repeated misrepresentations to Pell over an extended course of dealing, it should use his first day of Consol employment (February 10, 1971) as his adjusted service date.

We will affirm the District Court's rulings that Pell is entitled to relief and that DuPont must pay him a higher pension benefit going forward.  We will reverse the District Court's ruling that restitution for past low payments is unavailable, as well as its ruling that DuPont must use an adjusted service date

37

of August 1, 1972.  We will remand for the entry of an order consistent with this opinion.