NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4310
_____

KAREN JENKINS; JACQUELINE MAYS; TERESA LATTANZE; TORY JOHNSON;
JOHN VAN ALLEN, III; JOHN DOE; LINDA RUSSEL; DONNA ANDERSON;
RAYMOND GUNTHER; SHARON SCHULTZ; MICHELLE QUARLES; SUSAN
LOLLI; DEBRA KONTRA,

Appellants.

v.

UNION LABOR LIFE COMPANY; AMALGAMATED LIFE INSURANCE
COMPANY; INDUSTRIAL TECHNICAL AND PROFESSIONAL EMPLOYEES
UNION; OFFICE AND PROFESSIONAL INTERNATIONAL UNION,
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cv-07361)
District Judge:  Hon. Harvey Bartle, III
_____

Submitted Under Third Circuit LAR 34.1(a)
September 10, 2013

Before:  RENDELL, JORDAN and GREENAWAY, JR., *Circuit Judges*.

(Filed: September 16, 2013)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Karen Jenkins and eleven other former employees (collectively, the "Employees")
of The Amalgamated Life Insurance Company ("ALICO" or "Amalgamated Life")
appeal a grant of summary judgment to ALICO by the United States District Court for
the Eastern District of Pennsylvania on their claims for violations of the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002 *et seq.* For the
following reasons, we will affirm.

**I.      Background**

   *A.      Facts*

      *1.      ALICO Hires the Employees*

Prior to May 9, 2004, the Employees worked in the claims department of The
Union Labor Life Insurance Company, Inc. ("ULLICO") at a facility in King of Prussia,
Pennsylvania, known as the Pennsylvania Service Center ("PSC"). While employed by
ULLICO, the Employees were members of the Office and Professional Employees
International Union (the "OPEIU"), Local 153, and the terms and conditions of their
employment were governed by a collective bargaining agreement. As employees of
ULLICO, they were participants in a defined benefit pension plan.

On March 9, 2004, ULLICO entered into agreements pursuant to which it would
outsource its claims administration services to ALICO beginning on May 10, 2004.
Under those agreements, PSC employees would have the opportunity to work for

2

ALICO.  The agreements did not, however, require ALICO to maintain their pension benefits, nor did they provide for the transfer to ALICO of any part of ULLICO's defined benefit pension plan.  On March 11, 2004, ULLICO provided the PSC employees with letters informing them about the transition of their employment to ALICO.  Those letters told them that ALICO's "offer of employment likely will include permanent changes in the salary, benefits, and other terms and conditions of employment that you have experienced with ULLICO."  (App. at 537.)

The following week, ALICO distributed a document to the PSC employees containing "Questions and Answers for [ULLICO] Staff about Amalgamated Life" (the "Q&A").  (App. at 129.)  The Q&A responded to the question "[i]s there a Pension Plan?" by stating that "[t]here is a 3-year eligibility period for PSC employees to join the Amalgamated Life staff pension plan.  Once you become eligible, the 3-year wait period will be credited towards the 5-year vesting requirement."  (App. at 130.)  At around the same time, ALICO distributed to the PSC employees a document providing a general overview of certain employment benefits (the "General Overview").  The General Overview refers to a 401(k) savings plan but does not mention a defined benefit pension plan.

ALICO extended offers of employment to each of the Employees in letters dated April 7, 2004, that provided that, if they accepted, they would become ALICO employees on May 10, 2004.  With respect to benefits, the letters reminded them that they had

"received a *General Overview*" giving "a quick summary of our benefit programs."

(App. at 8 (italics in original) (internal quotation marks omitted).) None of the

Employees asked about participation in a defined benefit pension plan when they

received their offers of employment. All of the Employees accepted those offers,

ULLICO terminated them on May 9, 2004, and they became ALICO employees on May

10, 2004.

> 2. *The Collective Bargaining Agreements*

Days earlier, on May 7, 2004, ALICO and the Industrial, Technical and

Professional Employees Union (the "ITPEU"), a union affiliated with OPEIU, signed a

memorandum of understanding, stipulating that the ITPEU would be the exclusive

representative for the PSC employees for the purpose of negotiating a collective

bargaining agreement. The ITPEU subsequently raised the possibility of the new ALICO

employees participating in a defined benefit pension plan, but ALICO said that it could

not afford to provide those benefits to them. In December 2004, ALICO and the ITPEU

signed an agreement (the "2004 CBA") that would govern the terms of the PSC

employees' employment until December 31, 2006. The 2004 CBA did not contain any

provision that entitled the PSC employees to participate in ALICO's defined benefit

pension plan, although it did provide that they could participate in a 401(k) savings plan.

Each of the Employees received a copy of the 2004 CBA.

4

In March 2007, ALICO and the ITPEU entered into a second agreement (the "2007 CBA") that would govern the conditions of the PSC employees' employment from January 1, 2007, through December 31, 2009. During the negotiation of the 2007 CBA, the ITPEU again raised the possibility of the PSC employees' participation in a defined benefit pension plan, but ALICO again rejected that request, and the union settled for increased wages and enhanced severance benefits. As with the 2004 CBA, each of the Employees received the 2007 CBA and could note that it did not provide for participation in a defined benefit pension plan.

In 2009, ALICO and the ITPEU began negotiating a third agreement. In April 2010, after ITPEU members had already rejected one proposed agreement, ALICO proposed two alternatives, both of which provided that PSC employees would become participants in a defined benefit pension plan. Under one alternative, employees who met the plan's vesting requirements would accrue benefits beginning in June 2009, and under the other, they would receive higher cash compensation but would accrue benefits only after January 2011. The PSC employees voted to accept the second proposal, and, on May 4, 2010, ALICO and the ITPEU entered into a memorandum of understanding that fixed the terms of their continuing employment (the "2010 MOU").

### 3.    *ALICO Terminates the Employees*

In 2007, ULLICO decided not to renew its administrative service agreements with ALICO, but it agreed to a more limited arrangement that reduced the volume of claims

5

processed at the PSC. At that time, ALICO considered closing the PSC and moving

ULLICO's remaining claims processing work to one of its other offices, but decided not

to. However, the lease on the PSC facility was due to expire in February 2011, and, in

April 2010, ALICO began to consider closing it. Over the next several months, ALICO

reviewed a number of options for the PSC, ultimately deciding to consolidate it with

another of the company's operations. On October 8, 2010, ALICO informed PSC

employees that it was closing the facility, and their employment was terminated on

October 29, 2010.

### B.     Procedural History

Following their termination, the Employees filed an eight-count complaint against

ULLICO, ALICO, the OPEIU, and the ITPEU, alleging that they had been improperly

denied benefits under ALICO's defined benefit pension plan. The complaint stated

claims for violations of ERISA, seeking relief based on theories of unjust enrichment and

equitable estoppel, and for violations of the National Labor Relations Act, 29 U.S.C. §

151 *et seq.*, and the Labor Management Relations Act, 29 U.S.C. § 141 *et seq.*

Following discovery, each of the four defendants moved for summary judgment as

to the claims against it. In response, the Employees stipulated to the dismissal of all

claims against ULLICO, the OPEIU, and the ITPEU. The District Court granted

ALICO's motion to dismiss some of the claims against it, leaving only the ERISA claims.

6

On October 24, 2012, the District Court granted summary judgment to ALICO on those claims as well.

The Employees filed this timely appeal.

## II.    Discussion[1]

The Employees have appealed only the District Court's grant of summary judgment to ALICO on their equitable estoppel claim. ERISA § 502(a)(3) provides that "a beneficiary may 'obtain ... appropriate equitable relief ... to redress [ERISA] violations or ... to enforce any provisions of [ERISA].'" *Pell v. E.I. DuPont de Nemours & Co., Inc.*, 539 F.3d 292, 300 (3d Cir. 2008) (alterations in original) (quoting 29 U.S.C. § 1132(a)(3)). "A beneficiary can make out a claim for appropriate equitable relief based on a theory of equitable estoppel." *Id.* (citation and internal quotation marks omitted). But "[t]o succeed under this theory of relief, an ERISA plaintiff must establish (1) a

---

[1] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e), (f). We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review de novo district court orders granting or denying summary judgment," *Elassaad v. Independence Air, Inc.*, 613 F.3d 119, 124 (3d Cir. 2010), "apply[ing] the same test required of the district court and view[ing] inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party," *Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "may affirm the district court on grounds different from those relied on by the district court," *In re Mushroom Transp. Co. Inc.*, 382 F.3d 325, 344 (3d Cir. 2004), and "for any reason supported by the record," *Brightwell v. Lehman* 637 F.3d 187, 191 (3d Cir. 2011).

material misrepresentation, (2) reasonable and detrimental reliance upon the representation, and (3) extraordinary circumstances." *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir. 1994). Moreover, the Employees "bear the burden of proof on each estoppel element." *Int'l Union, U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 152 (3d Cir. 1999).

Because we conclude that the Employees have not met their burden with respect to either reasonable reliance or extraordinary circumstances, we confine our discussion to those two requirements.

### A. Reasonable Reliance

To prevail on their equitable estoppel claim, "[a]s the phrase 'reasonable and detrimental reliance' implies, ... [the Employees] must show (1) reasonableness and (2) injury." *Pell*, 539 F.3d at 301 (quoting *Curcio*, 33 F.3d at 237). The District Court did not address the reasonableness of the Employees' alleged reliance, and concluded only that the evidence supports an inference that at least some of them "relied to their detriment on [ALICO]'s misrepresentation regarding pension benefits." (App. at 31.) The Employees likewise focus on the element of injury, arguing that some of them would not have accepted ALICO's April 2004 offers of employment if they had known that they would not be enrolled in a defined benefit pension plan. The only evidence that the Employees point to in support of the reasonableness of their alleged reliance is the Q&A and General Overview which had been provided to them.

8

We conclude that that evidence is insufficient to meet the Employees' burden on the element of reasonable reliance. Based on all of the documents that the Employees received, this case is analogous to situations in which participants know that the plan sponsor reserves the right to alter or eliminate benefits at any time. Even if one thought that the Q&A's statement about eligibility for a pension plan meant that there was a defined benefit plan, as opposed to a 401(k) plan, there were several subsequent communications making it clear that no defined benefit plan participation was offered until 2010. We have said that "a participant's reliance on employer representations regarding benefits may never be 'reasonable' where the participant is in possession of a written document notifying him of the conditional nature of such benefits." *In re Unisys Corp. Retiree Med. Benefits ERISA Litig.*, 58 F.3d 896, 908 (3d Cir. 1995). And in such cases, we and other courts of appeals have rejected estoppel claims due to the participants' failure to establish reasonable reliance. *See id.* (concluding that the reservation of rights "undercuts the reasonableness of any detrimental reliance" by the plan participants); *Gordon v. Barnes Pumps, Inc.*, 999 F.2d 133, 137 (6th Cir. 1993) (concluding that ERISA plaintiffs "have not shown that they reasonably and detrimentally relied on any statements by the company" where they "knew or should have known from the express terms of the ... Plan that benefits could be altered at any time"); *Alday v. Container Corp. of Am.*, 906 F.2d 660, 666 (11th Cir. 1990) (dismissing

9

an equitable estoppel claim where the plan documents unambiguously stated that the employer reserved the right to modify or terminate the plan).

In this case, the Employees were in possession of documents that informed them not only that ALICO might not include them in its defined benefit pension plan, but that, in fact, it had not done so. First, before they received the Q&A, the letters from ULLICO regarding its decision to outsource PSC services notified them that ALICO's "offer of employment likely will include permanent changes in the salary, benefits, and other terms and conditions of employment that you have experienced with ULLICO." (App. at 537.) Second, the General Overview, which was the only benefits summary referred to in the letters offering employment to the Employees, referred only to a 401(k) savings plan and did not mention a defined benefit pension plan. Third, neither the 2004 CBA nor the 2007 CBA, copies of which were distributed to the Employees, provided for a defined benefit plan. *Cf. Allied Chem. & Alkali Workers of Am., Local Union No. 1 v. Pitt. Plate Glass Co., Chem. Div.*, 404 U.S. 157, 159 (1971) ("Under the National Labor Relations Act, ... mandatory subjects of collective bargaining include pension and insurance benefits for active employees ... ."). Moreover, nothing in the record suggests that, when ALICO offered future participation in a defined benefit pension plan as part of the negotiation of the 2010 MOU, any of the Employees expressed either surprise or dismay that they were not already vested participants in it.[2] We question whether the Employees

_____

[2] In fact, the PSC employees bargained to defer their accrual of benefits under the

10

could establish any reliance, let alone reasonable reliance, on references in the General Overview and Q&A to potential pension benefits in deciding to accept or continue employment at ALICO. But, assuming they did rely on those documents, that reliance was not reasonable in light of subsequent communications.

### B.    Extraordinary Circumstances

Even if the Employees had established reasonable reliance, "a plaintiff must do more than merely make out the ordinary elements of equitable estoppel to establish a claim ... under ERISA." *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996) (internal quotation marks omitted). "Our precedents indicate that an ERISA reporting or disclosure violation, such as the distribution of an inaccurate summary plan description, cannot provide a basis for equitable estoppel ... in the absence of 'extraordinary circumstances.'" *Gridley v. Cleveland Pneumatic Co.*, 924 F.2d 1310, 1319 (3d Cir. 1991).[3] "Extraordinary circumstances can arise where there are 'affirmative acts of fraud,' where there is a 'network of misrepresentations ... over an extended course of dealing,' or where particular plaintiffs are especially vulnerable." *Pell*, 539 F.3d at 303-04 (alterations in original) (quoting *Kurz*, 96 F.3d at 1553). We have found extraordinary

---

ALICO defined benefit plan by another two years in return for additional compensation.

[3] The "extraordinary circumstances" requirement comes from the fact that "ERISA contains two express causes of action to remedy reporting and disclosure violations as such," *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1167 (3d Cir. 1990) (citing 29 U.S.C. § 1132(a)(4), (c)), so those violations cannot ordinarily serve as the basis for substantive relief.

11

circumstances when an insurer informed a patient that certain coverage would be provided and then denied coverage, *Curcio*, 33 F.3d at 238, when a defendant repeatedly misrepresented the scope of coverage to a plan participant, *Smith v. Hartford Ins. Grp.*, 6 F.3d 131, 142 (3d Cir. 1993), and when an employer failed to make required contributions and the plan administrator allowed an employee to pay contributions himself, *Rosen v. Hotel & Rest. Emps. & Bartenders Union*, 637 F.2d 592, 598 (3d Cir. 1981).

Applying those principles, we find no support for the Employees' claim that extraordinary circumstances exist. Far from being the victims of a "network of misrepresentations," the Employees were plainly put on notice by the General Overview, the 2004 CBA, the 2007 CBA, and the 2010 MOU that they had not been granted participation in any ALICO defined benefit pension plan prior to 2010. The only conceivably confusing document was the Q&A that ALICO distributed, which, even if read to offer the possibility that pension benefits would include a defined benefit plan, was qualified by the more complete General Overview referred to in the offers of employment sent to the Employees. Nothing in the record suggests that the Employees – represented as they were by the ITPEU, and capable of trading pension benefits for additional compensation when given the chance – were especially vulnerable to the alleged misrepresentations in the Q&A. *Cf. Curcio*, 33 F.3d at 238 (finding special vulnerability where hospital denied coverage to patient for substantial claim after

12

representing that there was coverage); *Smith*, 6 F.3d at 142 (same). The Employees have thus failed to demonstrate extraordinary circumstances, and their equitable estoppel claim under ERISA must fail.

## III. Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.